951 F.2d 1223
 Bankr. L. Rep. P 74,438
In re CLUB ASSOCIATES, Debtor.
CLUB ASSOCIATES, Plaintiff-Appellant,
v.
CONSOLIDATED CAPITAL REALTY INVESTORS and First Union Real
Estate Equity and Mortgage Investments, Defendants-Appellees,
Consolidated Capital Equities Corporation, Defendant.
 No. 90-9056.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 28, 1992.
 
 Phillip A. Bradley, J. James Johnson, Steven J. Lawrence, Long, Aldridge & Norman, Atlanta, Ga., for plaintiff-appellant.
 J. Scott Jacobson, Frank X. Moore, Holt, Ney, Zatcoff & Wasserman, C. Richard McQueen, William D. Matthews, Daniel A. Angelo, Greene, Buckley, Jones & McQueen, Atlanta, Ga., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before FAY and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.
 MORGAN, Senior Circuit Judge:
 
 
 1
 This bankruptcy appeal presents the question of whether an hypothecation or pledge of a note and security deed as collateral for a loan is equivalent to a sale sufficient to trigger the right of first refusal in the security deed. Respectively granting summary judgment, both the bankruptcy court and the district court concluded that neither the decision to sell nor a sale was evidenced. After thoroughly reviewing the record, we affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In November, 1984, debtor-appellant Club Associates (Club), a Georgia limited partnership,[1] purchased the Tahoe Club Apartments in Dekalb County, Georgia, from appellee Consolidated Capital Realty Investors (CCRI), a California business trust, presently known as Vinland Property Trust. The apartment purchase was financed principally by a ten-year wraparound purchase money note from Club to Consolidated Capital in the amount of $22,000,000.[2] As security for the note, Club gave CCRI an All-Inclusive Deed to Secure Debt, Assignment of Rents and Security Agreement (security deed), the terms of which were negotiated by experienced commercial real estate attorneys representing Club and CCRI.
 
 
 3
 Club negotiated and received a right of first refusal to purchase the note before CCRI could sell the note.[3] Drafted by Club's counsel,[4] the first refusal right in the security deed provides:
 
 
 4
 Grantee hereby grants to Grantor a right of first refusal to purchase the Note and this Deed to Secure as hereinafter described. At such time as Grantee shall desire to sell the Note and this Deed to Secure Debt, Grantee shall determine the then current market discount rate which would be applicable to the Note and this Deed to Secure Debt, and Grantee shall give written notice to Grantor of its intention to sell the Note and this Deed to Secure Debt and shall offer Grantor a right to purchase the Note and this Deed to Secure Debt at a market price based upon the then current market discount rate. Grantor shall have thirty (30) days after receipt from Grantee of such written notice in which to inform Grantee of its intention with respect to the exercise of this right of first refusal to purchase the Note and this Deed to Secure Debt. In the event Grantor notifies Grantee that it does intend to purchase the Note and this Deed to Secure Debt at the price set forth by Grantee in its notice, Grantor shall have a total of ninety (90) days after its receipt from Grantee of the foregoing written notice in which to close the purchase of the Note and this Deed to Secure Debt. In the event Grantor declines to exercise its right of first refusal to purchase the Note and this Deed to Secure Debt, Grantor may within thirty (30) days after receipt of the foregoing written notice from Grantee make a counter-offer to Grantee to purchase the Note and this Deed to Secure Debt at such price as Grantor determines to be based on the then current market discount rate. In the event Grantor has made such a counter-offer to Grantee within such thirty (30)-day period, Grantee shall be prohibited from selling the Note and this Deed to Secure Debt within sixty (60) days after receipt of written notice of such counter-offer except on terms more favorable to Grantee than those contained in said counter-offer.
 
 
 5
 App. 2-56-21 (emphasis added). In connection with previous transfers of property interests, Club's counsel explained that he had drafted broad restrictive provisions, encompassing sales as well as the assignment of a security interest. R8-43 (Deposition of Donald Kennicott).
 
 
 6
 Following the closing on the Tahoe Club Apartments in 1984, CCRI subsequently needed to generate funds for operating cash. Although CCRI decided to use its real estate and loan assets to raise working capital, its financial consultants, defendant Consolidated Capital Equities Corporation (CCEC), advised against the sale of these securities because of tax consequences and the regulations applicable to CCRI as a real estate investment trust (REIT).[5] CCEC also determined that the Club note would not be salable unless it was refinanced, but that it could be used as collateral for a loan. Because CCRI is a California business trust, the authority to sell or to pledge any part of the trust estate resides in the trustees. The trustees clearly did want to raise operating capital. The record, however, does not evidence any act by the CCRI trustees revealing a decision to sell the Club note.
 
 
 7
 After exploring many financing possibilities, CCRI ultimately decided upon a series of loans, using apartment properties as collateral, with First Union Real Estate Equity and Mortgage Investments (First Union), an Ohio business trust. These loans closed on March 21, 1986. For the loan involving the Tahoe Club Apartments, CCRI borrowed $6,000,000 from First Union. CCRI entered into a security agreement with First Union, and gave First Union a collateral assignment of Club's note and security deed, including the conditional assignment of rents and leases, and a UCC-1.
 
 
 8
 CCRI paid a commitment fee for its loan from First Union. The First Union commitment letter references the three loan transactions as "hypothecation loans," and states that it confirms First Union's agreement to make and CCRI's agreement to accept "a loan ... in regard to the pledge and collateral assignment of certain promissory notes, deeds to secure debt, mortgages and other loan documents in the amount and upon the terms and conditions hereinafter set forth." R3-40-1. The loan commitment recites the interest rate schedule that CCRI agreed to pay First Union for the loan and includes a prepayment penalty.
 
 
 9
 Club's general partners, David Baker and Collins Powell, testified concerning their substantial experience in the acquisition and administration of sophisticated real estate syndications. Baker explained that it was common practice to pledge a note as collateral for a loan.[6] He clarified that the fact that a note is "tied to real estate in some way does not, should not have any bearing on" determining whether a pledge or a sale has occurred. R8-83 (Deposition of David Baker).
 
 
 10
 Baker conceded that CCRI received a valuable, monthly cash flow in the Club note in excess of the amount applied to the First Union loan, and that CCRI owned a sizable residual interest in Club's balloon payment under the wraparound note.[7] Id. at 86-87. Regarding possession of the note, he acknowledged that an investor note pledge involved relinquishing the right to possession of the note, and that CCRI could recover possession of the wraparound note if it elected to prepay the First Union obligation, despite the prepayment penalty. Id. at 93, 100. Baker also admitted that he had participated in transactions involving pledges of investor notes, when payments on an investor note would go directly to a new lender, and that he did not consider such a note to have been sold to the new lender. Id. at 97. Moreover, Baker acknowledged that CCRI had not approached him or Powell with an offer to sell the note in accordance with the terms of the security deed, rather CCRI repeatedly had represented to Club that the note could not be sold to Club or to anyone else because of tax consequences. Id. at 48. Significantly, Baker explained that he did not "think [CCRI's that] discussion [of the possibility of selling Club's note] is the same thing as desire [to sell]." Id. at 108.
 
 
 11
 In conjunction with its subsequent Chapter 11 bankruptcy case, Club filed in the bankruptcy court an adversary proceeding alleging that CCRI breached its contract with Club by violating the right of first refusal in the Club security deed in its transaction with First Union, and that First Union tortiously interfered with this first refusal right. On cross motions for summary judgment, the bankruptcy court granted summary judgment to CCRI and First Union because the sale or desire to sell the note and security deed was not evidenced:
 
 
 12
 The terms of the security agreement between CCRI and First Union show that CCRI did not convey all of its rights to First Union. In classic property law terminology, CCRI held a bundle of ownership rights of which it gave up some, conditioned some and retained some. Specifically, CCRI gave up the right to possession of the Club loan documents for as long as the obligation to First Union is outstanding but retained its rights to proceed as holder of the Club note and deed to secure debt upon default by Club. CCRI retained its right to sell the note conditioned on its duty to obtain First Union's consent. CCRI retained its rights to payments on the note by Club subject to its assignment of a portion of the payments to First Union. At maturity of the Club note, CCRI rather than First Union will receive a balloon payment of approximately $4 million. The CCRI-First Union agreement contains standard terms included in a security deed--e.g. power of sale upon default and a "due-on-sale" clause (grantor cannot sell without the written consent of grantee). The main differences are that First Union took physical possession of the CCRI-Club loan documents and Club was instructed to make payments on its note directly to First Union. Although CCRI voluntarily gave up some of the rights and privileges of ownership to obtain the loan from First Union, CCRI retained rights and privileges of ownership to the property, a note. Thus, no sale.
 
 
 13
 ....
 
 
 14
 If the right of first refusal clause in contention in the instant case contained the phrase "desire to sell, transfer, assign, hypothecate, or pledge all or any portion of the rights to payment of the note" rather than merely "desire to sell" the note, the parties would not now be before this court. As discussed above, however, only a sale is a sale. Therefore, it is necessary for Club to show that CCRI formed the desire to sell the notes. A desire to use the notes as security for a loan is not sufficient to constitute a breach of the contractual first right of refusal.
 
 
 15
 No evidence exists to show that the CCRI Board of Trustees decided or resolved to sell the note. The evidence does show, however, that CCRI was anxious to use the notes as a vehicle to obtain cash. If CCEC had advised CCRI that the best way to obtain the most cash was to sell the notes, CCRI may have quickly formed the desire to sell. CCRI was not so desperate for cash, however, that it would have formed the desire to sell without an analysis by CCEC of how the notes could best be used to raise the most cash. The evidence shows that not only the effects of provisions of the tax laws and REIT laws but also the "salability" of the Club note militated against sale and in favor of a loan.
 
 
 16
 R11-49-8-9, 10-11 (footnotes omitted) (emphasis added). In an amended order, the bankruptcy court explained:
 
 
 17
 In the instant case, CCRI retained its right to sell the note conditioned on its duty to obtain First Union's consent. Club's preemptive right gives it the opportunity to purchase the note ahead of any other party, only if CCRI desires to sell the note. The value of a preemptive right is in the priority it accords the holder over any other purchaser. The CCRI-First Union transaction does not foreclose the possibility that third parties may attempt to purchase the Note.
 
 
 18
 R7-74-6 (emphasis added).
 
 
 19
 Affirming the bankruptcy court's granting summary judgment to CCRI and First Union, the district court agreed that "Club did not contract for a right of first refusal should CCRI decide to hypothecate or obtain a loan with the note as security. CCRI's actions, therefore, neither breached nor triggered Club's preemptive right."[8] R1-10-12. On appeal to this court, Club has pursued its argument that CCRI effectively sold Club's note to First Union. Club, therefore, contends that CCRI has violated Club's contracted right of first refusal, and that First Union has interfered tortiously with Club's preemptive first refusal right. Alternatively, Club argues that CCRI's transaction with First Union substantially diminished the value of its first refusal right.
 
 II. ANALYSIS
 A. Standards of Review
 
 20
 " 'As the second court of review' " of a bankruptcy court's judgment,[9] this court examines independently the bankruptcy court's factual and legal determinations and employs the same two review standards used by the district court. In re Sublett, 895 F.2d 1381, 1384 (11th Cir.1990) (quoting Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir.1987)). Factual findings by the bankruptcy court are reviewed under the limited and deferential clearly erroneous standard. In re Sublett, 895 F.2d at 1383; In re Goerg, 930 F.2d 1563, 1566 (11th Cir.1991); see Fed.R.Bankr.P. 7052, 8013; see also In re Thomas, 883 F.2d 991, 994 (11th Cir.1989) ("The standard of review to be utilized by the court of appeals is the same as that to be utilized by the district court--'factual findings of the bankruptcy court cannot be set aside unless they are clearly erroneous.' " (quoting In re Downtown Properties, Ltd., 794 F.2d 647, 651 (11th Cir.1986))), cert. denied, --- U.S. ----, 110 S.Ct. 3245, 111 L.Ed.2d 756 (1990). Additionally, this court also has recognized that "a district court's conclusion that a bankruptcy court's factual finding is not 'clearly erroneous' is normally entitled to some persuasive weight." In re Sublett, 895 F.2d at 1384 n. 5. Because neither the district court nor this court has the authority to make independent findings of fact, " '[i]f the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court ... must remand the case to the bankruptcy court for the necessary factual determination.' " In re Sublett, 895 F.2d at 1384 (quoting Wegner, 821 F.2d at 1320); In re Chase & Sanborn Corp., 904 F.2d 588, 593 (11th Cir.1990).
 
 
 21
 In contrast, legal conclusions by the bankruptcy court and the district court are reviewed by this court de novo. In re Sublett, 895 F.2d at 1383; see In re Goerg, 930 F.2d at 1566; In re Chase & Sanborn Corp., 904 F.2d at 593. "While 'this court as an appellate court gives deference to all findings of fact by the fact finder if based upon substantial evidence, [this court] freely examines the applicable principles of law to see if they were properly applied and freely examines the evidence in support of any particular finding to see if it meets the test of substantiality.' " In re Thomas, 883 F.2d at 994 (quoting In re Fielder, 799 F.2d 656, 657 (11th Cir.1986) (per curiam)). Specifically, this court has held that a bankruptcy court's interpretation of unambiguous contractual language is a legal determination subject to de novo review. In re Sublett, 895 F.2d at 1384.
 
 
 22
 In this case, we give deference to the bankruptcy court's factual findings and accord some persuasive weight to the district court's conclusion that the factual findings of the bankruptcy court were not clearly erroneous. Significantly, the essential facts concerning the transactions in this case are not disputed by the parties. Our review of the record reveals that the district court correctly concluded that the bankruptcy court's factual findings were not clearly erroneous. The legal conclusions of the bankruptcy court and the district court, however, are subject to our de novo review.
 
 
 23
 Additionally, this court reviews a district court's order granting summary judgment de novo. Easterwood v. CSX Transp., Inc., 933 F.2d 1548, 1551 (11th Cir.1991); see In re Nash, 765 F.2d 1410, 1412 (9th Cir.1985) ("The bankruptcy court's grant of summary judgment, affirmed by the district court, is subject to de novo review."). "An order granting summary judgment is not discretionary and will be upheld only if everything in the record indicates that there is no genuine dispute over the material facts, and that the moving party is entitled to judgment as a matter of law." Brown v. Hughes, 894 F.2d 1533, 1536 (11th Cir.) (per curiam), cert. denied, --- U.S. ----, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990). Since we have determined that there are no genuine issues of material fact, our remaining determination is whether the moving parties were entitled to summary judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Easterwood, 933 F.2d at 1551; see Fed.R.Civ.P. 56(c). Therefore, we must decide de novo whether Club's right of first refusal was triggered or diminished by CCRI's transaction with First Union.
 
 
 24
 B. Hypothecation Loan or Sale?
 
 
 25
 To determine whether the right of first refusal was activated and resulted in a breach of contract by CCRI and tortious contractual interference by First Union, we must decide whether the CCRI-First Union transaction was included under the terms of the Club-CCRI contracted security deed. Executed in Georgia, the security deed is governed by Georgia contract law, lex loci contractus. See Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1444 (11th Cir.1991). "The interpretation of the language in a deed and in a contract is generally a question of law for the court unless it is so ambiguous that the ambiguity can not be resolved by the ordinary rules of construction." Hardman v. Dahlonega-Lumpkin County Chamber of Commerce, 238 Ga. 551, 233 S.E.2d 753, 755 (1977). Therefore, we must examine the first refusal language contained in the security deed in relation to the CCRI-First Union hypothecation loan to determine if that transaction actually constituted a sale triggering the preemptive right.
 
 
 26
 Explaining that the construction rules decided by Georgia courts are applicable in federal court when interpreting a contract controlled by Georgia law, this court instructed:
 
 
 27
 Under Georgia law, "[t]he cardinal rule of construction is to ascertain the intention of the parties." The courts are to afford greater regard to the clear intent of the parties than to any particular words which they may have used in expressing their intent. However unskillfully prepared a particular instrument or agreement may be, the courts are to discover and give effect to the intent of the parties if possible. Similarly, words in a contract are to be construed in the sense in which they are mutually employed by contracting parties, irrespective of the proper and logical meaning those words might otherwise carry.
 
 
 28
 Georgia R.R. Bank & Trust Co. v. Federal Deposit Ins. Corp., 758 F.2d 1548, 1551 (11th Cir.1985) (citations omitted) (emphasis added); see Carsello v. Touchton, 231 Ga. 878, 204 S.E.2d 589, 591-92 (1974) ("The paramount factor to consider in the interpretation of a contract is the true intention of the parties involved, and if that intention is clear, and it violates no established rule of law, it will be enforced, if sufficient words are utilized to express said intention."); Chelsea Corp. v. Steward, 82 Ga.App. 679, 62 S.E.2d 627, 632 (Ct.App.1950) ("Words are interpreted according to their primary acceptance or usual and common signification, unless from the context of the contract and the clear intention of the parties to be collected from it, they appear to be used in a different sense."). Additionally, "[i]t is the intention of the parties at the time the contract is made which governs." F & F Copiers, Inc. v. Kroger Co., 194 Ga.App. 737, 391 S.E.2d 711, 713 (Ct.App.1990) (citing O.C.G.A. § 13-2-4).
 
 
 29
 "Where the language of a contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible." Stern's Gallery of Gifts, Inc. v. Corporate Property Investors, Inc., 176 Ga.App. 586, 337 S.E.2d 29, 35 (Ct.App.1985). "[A] word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one." Dorsey v. Clements, 202 Ga. 820, 44 S.E.2d 783, 787 (1947) (emphasis added); see United States Fidelity & Guar. Co. v. Gillis, 164 Ga.App. 278, 296 S.E.2d 253, 255 (Ct.App.1982) (Contract language that is capable of only one logical interpretation is accorded its literal meaning, but terms that are susceptible of more than one reasonable interpretation are "uncertain of meaning or expression and, thus, ambiguous."). "The existence or non-existence of ambiguity is always a question of law for the court." Stern's Gallery, 337 S.E.2d at 35. Since interpretation of unambiguous contract terms is for the court solely, the former Fifth Circuit, deciding a contract case under Georgia law, concluded that "[m]erely because the parties disagree upon the meaning of contract terms will not transform the issue of law into an issue of fact." General Wholesale Beer Co. v. Theodore Hamm Co., 567 F.2d 311, 313 (5th Cir.1978) (per curiam) (emphasis added).
 
 
 30
 Initially, we must analyze the language of the first refusal provision contained in the security deed to determine if it is clear and susceptible to one reasonable interpretation or if any ambiguity exists. The activating language for Club's right of first refusal is the time at which CCRI shall "desire to sell" the Club note and security deed. Upon this occurrence, the first refusal provision specifies a detailed procedure "as hereinafter described." CCRI must determine the "then current market discount rate" and notify Club in writing "of its intention to sell" the note and security deed. The first refusal right provides for certain periods of time within which Club may inform CCRI that "it does intend to purchase" the note and within which Club has "to close the purchase." Similarly, the first refusal right provides that, if Club declines to exercise its right "to purchase" the note, then Club may make a counteroffer "to purchase" the note and security deed within a designated time. If Club makes a counteroffer, then CCRI "shall be prohibited from selling" the note and security deed for a delineated period "except on terms more favorable" to CCRI than those contained in Club's counteroffer.
 
 
 31
 It is apparent from the explicit procedures designating particular time periods for notification, counteroffer and closing as well as the repeated references to "sell," "purchase" and "close" that a definite sale of the note and security deed is meant by the first refusal provision. Read in context of the entire provision, mere contemplation of a sale, as the word "desire" could suggest and Club would have us define this term, is an unworkable meaning of that word in juxtaposition with the rest of the language in the first refusal right. The dominant references to terms of sale throughout the first refusal provision outnumber the single mention of "desire to sell." Furthermore, there would be no need to explain the details of the subsequent procedures, comprising the majority of the first refusal provision, if less than an intention to sell the note and security deed was described. While in this context of the entire first refusal provision, "decide," rather than "desire," might have been a more appropriate word, we conclude that the only reasonable interpretation must be a definite determination to sell rather than contemplation of a sale. See Rhodes v. Lane, 202 Ga. 608, 44 S.E.2d 114, 115 (1947) (The Georgia Supreme Court interpreted the language as "clear and unambiguous" in a partnership contract wherein "wish" or "desire" to sell property jointly owned required each partner to give the other the first option to purchase his half interest in the property should one of the partners actually decide to sell.). We find that there is no ambiguity in the first refusal provision at issue in this case.[10] It is clear that the right of first refusal, as written in its entirety, is not triggered until CCRI decides to sell the note and security deed. See Southern Fed. Sav. & Loan Ass'n v. Lyle, 249 Ga. 284, 290 S.E.2d 455, 458 (1982) ("Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties.").
 
 
 32
 Having determined that only a sale of Club's note and security deed could trigger its first refusal right, we must decide if the CCRI-First Union transaction, denominated as an "hypothecation loan," was a sale. The Georgia Supreme Court has recognized that "hypothecate" means to pledge property in order to borrow money, or as security for a loan. See Williamson v. Walker, 187 Ga. 603, 1 S.E.2d 718, 722 (1939) (A security deed to property was used as collateral to borrow money to pay debts.); J.J. Fowler, Inc. v. Fulton Nat'l Bank, 145 Ga.App. 220, 243 S.E.2d 642, 643 (Ct.App.1978) (A note was executed as well as "a security agreement hypothecating and assigning to the bank" equipment.). Georgia cases have used the term "hypothecation" with reference to a security agreement rather than a sale. See, e.g., Reeves v. Habersham Bank, 254 Ga. 615, 331 S.E.2d 589 (1985); Rainer v. Security Bank & Trust Co., 182 Ga.App. 171, 354 S.E.2d 882 (Ct.App.1987); Breitzman v. Heritage Bank, 180 Ga.App. 171, 348 S.E.2d 713 (Ct.App.1986); Fleming v. First American Bank & Trust Co., 171 Ga.App. 295, 319 S.E.2d 119 (Ct.App.1984); Whitmire v. Canal Ins. Co., 102 Ga.App. 611, 117 S.E.2d 348 (Ct.App.1960); see also Carbine v. Commissioner, 777 F.2d 662, 663 (11th Cir.1985); United States v. Jones, 707 F.2d 1334, 1337 (11th Cir.1983) (per curiam) (In Georgia cases, this court has used "hypothecate" to reference security for loans.).
 
 
 33
 "A sale is distinguishable from a pledge or a pawn in that a sale passes title while in a pawn, possession passes, but not title.... The pledge creates a lien upon property but not title to it." Bromley v. Bromley, 106 Ga.App. 606, 127 S.E.2d 836, 838 (Ct.App.1962). A contracted right of first refusal is a burden on property and is carried with a security deed, or the security deed is subject to the right of first refusal. See Hornsby v. Holt, 257 Ga. 341, 359 S.E.2d 646, 648 (Ct.App.1987). Only a sale or an option to purchase can trigger a right of first refusal, and not the use of property as collateral for a loan. See Hasty v. Health Serv. Centers, Inc., 258 Ga. 625, 373 S.E.2d 356, 358 (1988).
 
 
 34
 The documentation of the CCRI-First Union transaction clearly is structured as a loan. Among the documents that CCRI gave First Union to secure the $6,000,000 loan was a collateral assignment of the Club note and security deed, including rents and leases, and a UCC-1. These documents signify a loan and not a sale. CCRI paid a commitment fee and interest to First Union as part of the transaction, additional indicia of a loan. Club's monthly payments, which would have gone to CCRI under the original agreement, were transferred to First Union. Although First Union acquired possession of the Club note and security deed used as collateral for CCRI's loan, it did not obtain title. Baker conceded that a lender's physical possession of a borrower's note and security deed, is common in commercial real estate loan transactions.
 
 
 35
 Significantly, CCRI retained substantial residual ownership rights. CCRI received valuable monthly funds from the Club note in excess of the amount applicable to the First Union loan, and CCRI also held a sizable interest in Club's balloon payment under the wraparound note. If Club had defaulted in its payments to First Union, then First Union's recourse would have been against CCRI. In turn, CCRI would have had recourse against Club.
 
 
 36
 Moreover, the undisputed facts in this case contradict the sale argument advanced by Club. CCRI received a $22,000,000 note and security deed from Club to finance Club's purchase of the Tahoe Club Apartments. CCRI subsequently needed to raise operating capital, and sought expert advice concerning methods by which it could generate these funds. Even if CCRI had considered selling Club's note and security deed, CCEC informed CCRI that it should not sell the Club note because of tax and REIT consequences, and indeed that it could not sell the note without refinancing. Club's general partner Baker testified that discussing a sale and desiring to sell are not equivalent. He went so far as to state that a desire to sell can be formulated only after there is a viable offer to buy. There is no evidence that there were any purchase offers for the Club note, or that CCRI's California trustees ever negotiated or approved a sale of the Club note and security deed. Since selling the Club note was not feasible, CCRI plainly did not make the decision to sell the Club note.
 
 
 37
 CCEC, however, did advise CCRI that the Club note could be used to obtain money by pledging it as collateral for a loan. Therefore, CCRI made the business decision to hypothecate Club's note or to pledge it as collateral to borrow $6,000,000 from First Union. Whereas it is not unusual for the value of collateral to exceed the loan amount, such as the $22,000,000 wraparound note pledged as security for the $6,000,000 loan in this case, a sale customarily is not transacted for less than the value of the item sold.[11] The discrepancy between these amounts after CCRI's obligation to First Union is satisfied is compelling evidence that a sale did not occur.[12]
 
 
 38
 Under the terms of the first refusal provision, CCRI would have had to offer Club its note for purchase first if CCRI decided to sell the note, but not if it used the note as collateral for a loan. The holder of a note does not go to the maker of the note to borrow money. It is as illogical to postulate that Club, which had given CCRI a $22,000,000 wraparound note, was in a position to lend CCRI funds as it is to claim that CCRI was in a position to sell Club's note and security deed. Neither proposition makes any business sense.
 
 
 39
 Because CCRI could not sell Club's note and security deed, it used this asset as collateral for a loan from First Union. Club's contention that a sale occurred in this CCRI-First Union transaction belies the business realities of the situation. In context with the entire first refusal provision and in conjunction with the economic realities of the two financial transactions in this case, the "desire to sell" language unambiguously means a sale and withstands Club's strained interpretation encompassing a loan. Club cannot succeed in converting a loan agreement into a purchase agreement. We conclude that Club's contracted right of first refusal was not triggered by the CCRI-First Union transaction, which was a loan and not a sale.
 
 
 40
 C. Diminishment in the Right of First Refusal
 
 
 41
 Club alternatively has argued that its right of first refusal was diminished by the CCRI-First Union transaction. A right of first refusal is " '[a] preemptive right [which] merely sets a requirement that when the owner decides to sell the person holding the preemptive right must be offered the opportunity to buy.' " Hasty v. Health Serv. Centers, Inc., 258 Ga. 625, 373 S.E.2d 356, 357 (1988) (emphasis in original) (quoting Shiver v. Benton, 251 Ga. 284, 304 S.E.2d 903, 905 (1983)); see Hewatt v. Leppert, 259 Ga. 112, 376 S.E.2d 883, 884 (1989) ("When a lease contains a right of first refusal clause the landlord 'is under a legal duty to [the tenant] not to sell to anybody at any price until after he has made an offer to sell to [the tenant] at that price and [the tenant] has failed to accept it.' " (emphasis in original) (quoting 1A Corbin on Contracts § 261 at 471 (1963)). Therefore, the value in a right of first refusal is in the priority that the holder is accorded, or the first opportunity to purchase.
 
 
 42
 Georgia courts have found the right of first refusal is violated when a sale occurs without honoring this preemptive right. See, e.g., Emery Air Freight Corp. v. Arogeti, 259 Ga. 839, 388 S.E.2d 517 (1990) (Conveyances of property without proper recognition of first refusal right were void regarding the rights and interests of the holder of the preemptive right.); Rollins v. Gault, 153 Ga.App. 781, 266 S.E.2d 560 (Ct.App.1980) (Party was deprived of its first refusal right when a contract for sale of a house was executed with a third party.); see also Systems Engineering Assocs. v. Peachtree Corners, Inc., 179 Ga.App. 48, 345 S.E.2d 136 (Ct.App.1986) (Despite finalized negotiations to sell a warehouse to another party, when the first refusal right was discovered during the title search, the holder of that preemptive right was given the opportunity to exercise the preemptive right, and elected to repurchase the property.). Additionally, "the preemptive right of first refusal may not be defeated by the offer of a third party to purchase the land in question as part of a package transaction including one or more additional tracts, even if the purchase price is allocated among the several tracts." Hinson v. Roberts, 256 Ga. 396, 349 S.E.2d 454, 456 (1986).
 
 
 43
 In contrast to the breach or violation of a first refusal right by a sale without recognition of that preemptive right, the Georgia Supreme Court has explained that a first refusal right can be diminished by an option contract. Hewatt, 376 S.E.2d at 884-85. In Hewatt, a landlord accepted consideration from a corporation to keep an offer to purchase open for a specified time, during which the landlord could not offer to sell the property to any other party, and after which the party acquiring the option had no obligation to purchase the property. By making an irrevocable offer to sell, the landlord placed the power to buy completely with the option holder for a time certain. Effectively removing the property from the market until the option holder decided whether to purchase the property, the landlord "substantially diminished the value of the right of first refusal by executing the option and thereby eliminating the possibility that he would receive an acceptable offer from a party other than [the option holder]." Id. at 885. The court noted that "[t]he holder of an option can compel a sale by an unwilling owner." Id. Thus, the preemptioner's ability to make the same offer is lost, and "[t]he essence of the ... right of first refusal [i]s the possibility of matching a third party's acceptable offer." Id. (emphasis in original). While the first refusal right is not triggered until the option holder decides to purchase, the preemptive right is destroyed temporarily during the option period.
 
 
 44
 The apparent diminished value in the preemptive first refusal right because of the existence of an option contract is not present in this case. CCRI did not convey an option to purchase to First Union; it hypothecated or pledged the Club note as collateral to First Union for CCRI's loan. This hypothecation does not violate Club's preemptive first refusal right, the purpose of which is to assure the preemptioner priority over any other purchaser when there is a decision to sell. See Shiver, 304 S.E.2d at 905.
 
 
 45
 If CCRI subsequently decides to sell the Club note and security deed, obtains a purchaser, and First Union consents to the sale, then CCRI would have to offer the note to Club first on the same terms. As we have explained, however, Club's preemptive right does not restrict the use of the note and security deed as collateral. Because we have determined that no option to purchase was accorded to First Union, we conclude that Club's right of first refusal remains intact and has not been diminished by CCRI's hypothecated loan transaction with First Union.
 
 III. CONCLUSION
 
 46
 In addition to our determination that no sale by CCRI to First Union occurred to trigger Club's right of first refusal, we also have concluded that Club's preemptive right was not diminished by CCRI's use of Club's note and security deed as collateral for CCRI's loan from First Union.[13] Having found no genuine issues of material fact in this case, we also conclude that summary judgment was appropriate as a matter of law. See Foshee v. Harris, 170 Ga.App. 394, 317 S.E.2d 548, 549 (Ct.App.1984) ("[T]he construction and interpretation of a written contract, of which the terms are unambiguous, is peculiarly well suited for adjudication by summary judgment."). We, therefore, AFFIRM the district court's grant of summary judgment to CCRI and First Union.
 
 
 
 [1]
 Investors Realty Group (IRG), a general partner in Club, is comprised of two partners, David Baker and Collins Powell. Through IRG, Baker and Powell conducted the negotiations relevant to this case on behalf of Club. IRG's attorney, Donald Kennicott, negotiated and drafted the pertinent documents for Club. Prior to the closing on the apartment property involved in this case, IRG assigned its rights to Club. To simplify our recitation of the relevant facts in this case, actions by Baker, Powell or Kennicott will be considered and stated herein to be those of Club
 
 
 [2]
 The $22,000,000 note contained an $8,000,000 underlying debt
 
 
 [3]
 In return for CCRI's requested variable, rather than fixed, interest rate for the last three years of the ten-year wraparound Club note, Club requested and received a right of first refusal to purchase the note
 
 
 [4]
 Donald Kennicott, Club's counsel, explained that his law firm prepared the first draft of the purchase agreement for Club, and that he personally wrote the right of first refusal provision in the security deed. R8-28, 36-37 (Deposition of Donald Kennicott). When specifically questioned regarding the derivation of the first refusal provision, Kennicott responded: "If you are referring to what everybody has been referring to in this case as the, quote, right of first refusal, yes, I wrote those words." Id. at 37 (emphasis added)
 
 
 [5]
 David Baker, Club's general partner, explained that CCRI's representatives informed him that CCRI would not sell the Club note because of adverse tax consequences. R8-47-48 (Deposition of David Baker)
 
 
 [6]
 At his deposition, Baker explained that "[i]t's common practice in the industry in syndications to take notes from investors and take those notes to a bank and borrow against them, investor note financing. We did that all the time." R8-77 (Deposition of David Baker). He stated that, in the "majority" of the partnership's syndications, "[w]e did take notes and use them as security for other notes," and that these transactions were "loans." Id. at 77, 78. Powell testified that hypothecation "was just a synonym for pledge." R8-38 (Deposition of Collins Powell). In instances when the partnership had borrowed money from a lender and used collateral to secure repayment, he acknowledged that he was not aware that anyone had taken the position that the partnership had sold the property. Id. at 44
 
 
 [7]
 Initially, CCRI's payments to First Union equalled the payments owed by Club to CCRI. After the CCRI-First Union transaction, Club was instructed to make payments directly to First Union. In December, 1987, Club's monthly obligation to CCRI exceeded CCRI's obligation to First Union by $14,000 a month. While continuing to collect monthly payments from Club, First Union remitted the excess to CCRI. When CCRI's obligation to First Union is satisfied, Club will owe CCRI approximately $8,000,000. If paid in due course, then balloon payments for the wraparound note first will be used to satisfy the underlying debt, then that of First Union, and finally the remainder of the Club-CCRI loan
 
 
 [8]
 The district court specifically agreed with the bankruptcy court's determination that CCRI not only did not sell Club's note, but also did not form the desire to sell the note:
 The Bankruptcy Court found that CCRI could form the requisite desire to sell the note only if it decided to accept a firm offer. The Court agrees with this finding to the extent that to trigger the right of first refusal, CCRI could not merely contemplate the possibility of a sale, but must affirmatively decide to pursue a serious offer. To hold otherwise would require that CCRI offer the note to Club whenever it reviewed the economic feasibility of a sale. Surely, the agreement between CCRI and Club did not envision so onerous a task for CCRI.
 R1-10-9-10 (emphasis added).
 
 
 [9]
 Under 28 U.S.C. § 158(a), district courts have jurisdiction to hear appeals from final judgments, decrees and orders by bankruptcy courts. Through 28 U.S.C. § 158(d), "[t]he courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."
 
 
 [10]
 Even if we had found ambiguity in the phrase "desire to sell," we would have construed the language against Club's interpretation. While experienced real estate syndication attorneys representing both Club and CCRI negotiated the terms of the security deed, the first refusal provision at issue in this case was drafted by Club's attorney. "As a general rule the provisions of a contract will be construed against the draftsman...." Stern's Gallery, 337 S.E.2d at 35; see Tackitt v. Prudential Ins. Co., 758 F.2d 1572, 1575 (11th Cir.1985) (In a Georgia case, this court held that "ambiguous contracts are construed against their authors...."); Jones v. Barnes, 170 Ga.App. 762, 318 S.E.2d 164, 167 (Ct.App.1984) (Georgia courts are bound to construe uncertain or ambiguous contract language against the draftsman.); Barnett Mortgage Trust v. Woods Mill, Ltd., 151 Ga.App. 133, 259 S.E.2d 140, 141 (Ct.App.1979) (The meaning of ambiguous contract language is construed against the preparer.); see also O.C.G.A. § 13-2-2(5) (Doubtful contract construction generally is construed most strongly against the party undertaking the obligation.)
 Club could have used language in the first refusal provision to include a pledge or hypothecation for a loan. See Dedousis v. First Nat'l Bank, 181 Ga.App. 425, 352 S.E.2d 577, 578 (Ct.App.1986) (Among the powers authorized by the subject agreement were "[t]o bargain and agree to buy, sell, mortgage, hypothecate" and to execute deeds, leases, mortgages, notes and hypothecations.); Parker v. Vrooman, 87 Ga.App. 287, 73 S.E.2d 777, 778 (Ct.App.1952) (The contract provided that "in order to secure the monies represented by the notes, to sell, transfer, assign, or hypothecate the notes...."). Because Club's counsel did not draft the first refusal right in such an inclusive manner, Club must abide by the contract provision that it prepared and executed.
 
 
 [11]
 No party in this case has represented or even suggested that the $22,000,000 wraparound note has been so reduced in value that it is worth only $6,000,000
 
 
 [12]
 At the end of CCRI's obligation to First Union, Club will owe CCRI approximately $8,000,000, indicating CCRI's substantial remaining interest in the Club note
 
 
 [13]
 Club also has raised as an appellate issue the bankruptcy court's failure to rule on Club's objections and motion to strike the Steven K. McGinnis affidavit, filed in conjunction with CCRI's motion for summary judgment. Rule 61 of the Federal Rules of Civil Procedure, incorporated in Rule 9005 of the Federal Rules of Bankruptcy Procedure provides that no error in the admission or exclusion of evidence, defect in any ruling, or "in anything done or omitted by the court" is ground for "vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice" and the court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Fed.R.Civ.P. 61 (emphasis added); Kane v. Johns-Manville Corp., 843 F.2d 636, 647 (2d Cir.1988); see In re Carapella, 115 B.R. 365, 368 (Bankr.M.D.Fla.1990) (Under the harmless error rule, a district court reviewing the judgment of a bankruptcy court "may disregard errors which do not affect substantial rights."), aff'd mem., 925 F.2d 1474 (1991)
 "An error is presumed harmless unless it affected the substantial rights of a party. The party asserting error has the burden of proving that the error prejudiced a substantial right of that party." United States v. Killough, 848 F.2d 1523, 1527 (11th Cir.1988) (citations omitted). There is no evidence or indication in the orders of the bankruptcy court and district court that either court relied on the McGinnis affidavit in making their respective determinations that the CCRI-First Union transaction was a loan and not a sale, and that the transaction did not diminish Club's right of first refusal. Club, therefore, has not proved that any of its substantial rights were prejudiced by the bankruptcy court's failure to rule on Club's objections and motion to strike this affidavit. We find this appellate issue propounded by Club to be meritless.