352 S.E.2d 93

**John LAYA and Thelma Laya, His Wife,**

v.

**ERIN HOMES, INC., a Corporation, Michael Ferns, Individually, and Mike Ferns, dba Erin Homes, Inc.**

**No. 16965.**

Supreme Court of Appeals of
West Virginia.

Dec. 16, 1986.

**344**

A. Dana Kahle, Wheeling, for appellants.

McHUGH, Justice:

This action is before this Court upon appeal by the plaintiffs/appellants, John Laya and Thelma Laya, husband and wife, from a final order entered by the Circuit Court of Ohio County, West Virginia (the trial court), dismissing two of the named defendants, namely, Michael Ferns, individually, and Mike Ferns doing business as Erin Homes, Inc., leaving as a defendant only Erin Homes, Inc., a corporation. The appellants contend that the dismissal of these two defendants upon a motion for summary judgment was improper. We agree and reverse and remand.

I

Michael Ferns and Lawrence Finneran were the incorporators of Erin Homes, Inc. in May, 1978. Ferns was one of the initial directors of the corporation and initially was secretary-treasurer of the corporation. Finneran was one of the initial directors of the corporation and initially was president of the corporation. Finneran's wife was also one of the initial directors of the corporation. There is nothing in the record to indicate that any meetings of the directors or shareholders were held prior to January 2, 1980. On that date, at a special meeting of the shareholders, Finneran and his wife resigned as directors, Finneran resigned as president, and Ferns, his wife, and his then personal secretary, Rosemary Bodey (she is no longer an employee) were elected as the new directors. At that meeting Ferns became the president and his wife became the secretary-treasurer. There is no evidence that there have been any meetings of the directors or shareholders after January 2, 1980.

According to the stock records of the corporation, Ferns and Finneran on June 1, 1979 were each issued a stock certificate representing 100 shares of capital stock. The corporation was authorized to issue 500 shares of stock at a par value of $10.00. Finneran gave a promissory note for $1,000.00 to the corporation for his stock.[1] There is no evidence that the corporation ever received any cash payments from Finneran for his stock, and his promissory note was canceled upon his resignation as a director and president. Similarly, there is no evidence that Ferns ever paid any portion of the $1,000.00 for his 100 shares of $100.00 par stock.

According to undated "bills of sale," certain equipment (house-moving equipment, a highlift, a backhoe and miscellaneous equipment) was contributed to the corporation by Ferns shortly after incorporation. The house-moving equipment was purchased originally by Ferns for about $6,500–$6,700. The corporation according

---

1. *W.Va.Code*, 31–1–82 [1974] provides, in relevant part: "Neither promissory notes nor future services shall constitute payment or part payment for the issuance of shares of a corporation."

to the "bill of sale" assumed a debt of $5,220 on this equipment. Similarly, the corporation assumed liabilities of $5,995.94, $7,991.93 and $17,752.00, respectively, for the highlift, backhoe, and miscellaneous equipment. There is no record of any cash payments or issuance of shares of stock by the corporation for any of this equipment. The house-moving equipment was stored in Ferns' personal garage. The record is silent on where the other equipment was stored. The corporation purportedly paid $10,000.00 to an unrelated person for two parcels (five acres) of real estate, but there is no record of payment.

No corporate minutes were maintained after January 2, 1980. The corporate office was located in the same office as Ferns' other corporate business, Pike Homes, Inc., a dealer in mobile homes, formed in the year 1976. Ferns and Finneran are the only shareholders in Pike Homes, Inc. Erin Homes, Inc. was also a mobile home dealer until sometime in the year 1982, when the nature of the business was changed by Ferns to that of home remodeling.

The federal corporate income tax returns reflect "buildings and other assets." For example, at the beginning of the year 1980 such assets were listed at $61,455.00 and at the end of that year at $54,520.85. (The record does not indicate the amount of depreciation.) There is no evidence as to how these figures, or most of the other figures on the income tax returns for each year, were ascertained by the certified public accountant who prepared the tax returns. For example, there is no evidence of corporate records of any sales or other disposition of corporate assets. The 1980 federal corporate income tax return shows gross receipts of $463,987.65 from mobile home sales, and cost of goods sold in the amount of $374,256.62, for net sales proceeds of $89,731.03. The tax return shows $34,428.00 of interest incurred on loans to purchase the inventory of mobile homes. The record contains no information on these loans, such as the name of the lenders and whether there were any personal obligations for these loans imposed upon Ferns.

In his deposition testimony Ferns asserted that he never commingled his personal funds with the funds of Erin Homes, Inc. The corporation has always had its own checking account and all mobile home sales proceeds were deposited therein. The corporation leased in its own name from an unrelated person the real property upon which the mobile home sales business was located. Erin Homes, Inc. has filed federal income tax returns each year, using its own federal identification number. It has a West Virginia business registration certificate; it makes payments to the workers' compensation and unemployment compensation funds.

On October 1, 1980, John Laya and Thelma Laya, husband and wife, contracted with Erin Homes, Inc. to purchase from the latter a certain mobile home. Michael Ferns signed the contract as president of the corporation. The Layas "traded in" a certain pick-up truck and were given $5,000.00 credit toward the $17,500.00 purchase price of the mobile home; on October 31, 1980, the Layas also paid $12,500.00 in cash for the balance of the purchase price of the mobile home. The Layas shortly thereafter received the title to the mobile home.

The Layas allege that, contrary to the agreement, the mobile home was not subsequently delivered to them but was retained on the premises of Erin Homes, Inc. and was used by Erin Homes, Inc. as an unlocked exhibition model. The Layas allege that the trailer was allowed to fall into a state of disarray and disrepair, greatly impairing the value of the trailer.

In addition, the Layas incurred $8,500.00 in expenses for erection of a foundation for the trailer on their lot and for necessary excavation and earth moving to provide the proper ingress and egress to their lot for the equipment necessary to place the mobile home thereon.

The Layas also allege that the mobile home was moved by Erin Homes, Inc. at some time thereafter to another location, adjacent to a public highway, where it has

been damaged by unknown persons (broken windows, stolen interior fixtures, etc.).

The Layas brought this action in August, 1981, against Erin Homes, Inc., a corporation, Michael Ferns, individually, and Mike Ferns, doing business as Erin Homes, Inc. For the alleged breach of contract by the defendants outlined above, the plaintiffs sought rescission of the contract and recovery of the $17,500.00 purchase price of the mobile home, together with the consequential damages of $8,500.00 for excavation and earth-moving.

The plaintiffs also sought $50,000.00 for pain, suffering and mental anguish caused by the defendants' conduct and $250,000.00 for punitive damages resulting from "the willful and deliberate misconduct of the defendants by refusing to perform the conditions of the contract and permitting the trailer to be wasted, for a total of $326,000.00 to be awarded unto the plaintiffs[.]"

The defendants' answers, each of which was prepared by the same attorney, denied the material allegations of the complaint with respect to the alleged breach of contract. The defendants later filed motions *in limine*, including a motion for summary judgment to prevent the plaintiffs from attempting to "pierce the corporate veil" of Erin Homes, Inc. to reach the personal assets of Michael Ferns.

The trial court granted the defendants' motion for summary judgment and dismissed Michael Ferns, individually, and Mike Ferns, doing business as Erin Homes, Inc., as defendants in this action. The trial court was of the opinion that the evidence relied upon by the plaintiffs (the deposition of Michael Ferns) was insufficient to justify Ferns' individual liability because there was no evidence of fraud and insufficient evidence to find that Michael Ferns had completely disregarded the corporate existence so that "piercing of the corporate veil" would be necessary to avoid an injustice to the plaintiffs.

The plaintiffs thereafter prosecuted this appeal. They claim that equity requires the corporate entity to be disregarded in this case to make the alleged real party in interest, the individual actor, liable.

II

■ *W.Va.Code,* 31–1–89 [1974] provides, in pertinent part: "A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration for which such shares were issued or to be issued." That is, a corporate shareholder's liability is usually limited to his or her capital investment in the corporation, and the shareholder is normally not liable individually to a creditor of the corporation. This limited liability is one of the legitimate advantages of doing business in the corporate form. "The organization of a corporation for the avowed purpose of avoiding personal responsibility does not of itself ... justify disregard of the corporate entity." 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.20 (rev.perm.ed. 1983). Professor David H. Barber, another leading authority in this area of the law, also recognizes this point:

Given the purpose of promoting commerce by providing limited liability for shareholders in state corporation laws, courts have been reluctant to pierce the corporate veil, even when the express purpose of incorporation was to limit the liability of the incorporators. Indeed, courts of every jurisdiction have recognized the legitimacy of incorporating to avoid personal liability. Consequently, something more than the shareholders' desire to avoid personal liability must exist to justify piercing the corporate veil.

Barber, *Piercing the Corporate Veil,* 17 Willamette L.Rev. 371, 373 (1981) (footnotes omitted). *Accord,* Note, *Confronting Close Corporate Status in West Virginia: Alternative Theories to Prevent Abuse to the Detriment of Creditors,* 86 W.Va.L.Rev. 139, 141 (1983). The concept of limited shareholder liability applies generally to a close corporation, as well as to a corporation whose shares are publicly trad-

ed.[2] "Our state law [*W. Va. Code*, 31–1–26 [1974]] permits close corporations, with one shareholder, so we cannot [properly] disregard a corporation solely because it has one ... shareholder[ ]." *Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 788, 320 S.E.2d 515, 524 (1984).

In addition to its recognition in the West Virginia Corporation Act, *W. Va. Code*, 31–1–1 to 31–1–158, as amended, the principle of limited shareholder liability is recognized in case law as a derivative of the principle that a corporation and its shareholder(s) are presumed to be separate legal entities. "The law presumes ... that corporations are separate from their shareholders." Syl. pt. 3 (in part), *Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 320 S.E.2d 515 (1984). "[T]he burden of proof is on a party soliciting a court to disregard a corporate structure." *Id.*, 173 W.Va. at 787, 320 S.E.2d at 522.

Under exceptional circumstances, the corporate entity may be disregarded to remove the barrier to personal liability of the shareholder(s) actively participating in the operation of the business. "Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong. However, the corporate form will never be disregarded lightly." *Southern States Cooperative, Inc. v. Dailey*, 167 W.Va. 920, 930, 280 S.E.2d 821, 827 (1981). This Court expressed the principle of "piercing the corporate veil" in the following manner in syllabus point 10 of *Sanders v. Roselawn Memorial Gardens, [Inc.,]* 152 W.Va. 91, 159 S.E.2d 784 (1968):

> While, legally speaking, a corporation constitutes an entity separate and apart from the persons who own it, such is a fiction of the law introduced for purpose of convenience and to subserve the ends of justice; and it is now well settled, as a general principle, that the fiction should

be disregarded when it is urged with an intent not within its reason and purpose, and in such a way that its retention would produce injustices or inequitable consequences.

*Accord, Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 786–87, 320 S.E.2d 515, 521–22 (1984); syl.pt. 4, *Caflisch Lumber Co. v. Lake Lynn Lumber & Supply Co.*, 119 W.Va. 668, 195 S.E. 854 (1938); syl.pt. 4, *Tynes v. Shore*, 117 W.Va. 355, 185 S.E. 845 (1936). *See generally* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 41, 41.10, 41.20 (rev.perm.ed. 1983); annotation, *Stockholder's Personal Conduct of Operations or Management of Assets as Factor Justifying Disregard of Corporate Entity*, 46 A.L.R.3d 428 (1972); 18 Am.Jur.2d *Corporations* §§ 43–45 (1985); 18 C.J.S. *Corporations* §§ 6–7 (1939).

"Piercing the corporate veil" is an equitable remedy, the propriety of which must be examined on an *ad hoc* basis. *See* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41.25 (rev.perm. ed. 1983). "[D]ecisions to look beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details." *Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 787, 320 S.E.2d 515, 523 (1984).

Some of the factors to be considered in deciding whether to pierce the corporate veil are:

(1) commingling of funds and other assets of the corporation with those of the individual shareholders;

(2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders);

(3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock,

---

**2.** We use the term "close corporation" in this opinion to mean "a corporation whose shares are not generally traded in the securities markets. This definition seems to be most nearly in

accord with the linguistic usages of the legal profession[.]" 1 F. O'Neal, *Close Corporations* § 1.02 (2d ed. 1971).

such as formal approval of the stock issue by the board of directors;

(4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation;

(5) failure to maintain corporate minutes or adequate corporate records;

(6) identical equitable ownership in two entities;

(7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties);

(8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking;

(9) absence of separately held corporate assets;

(10) use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation;

(11) sole ownership of all the stock by one individual or members of a single family;

(12) use of the same office or business location by the corporation and its individual shareholder(s);

(13) employment of the same employees or attorney by the corporation and its shareholder(s);

(14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders (sole shareholders do not reveal the association with a corpo-

ration, which makes loans to them without adequate security);

(15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities;

(16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity;

(17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another;

(18) contracting by the corporation with another person with the intent to avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions;

(19) the formation and use of the corporation to assume the existing liabilities of another person or entity.[3]

Examination of the numerous relevant factors in a "totality of the circumstances" test provides a more enlightening analysis than merely applying metaphors, like "simulacrum," "alter ego," "instrumentality," etc., to describe the unity of the shareholder(s) and the corporation justifying, where equitable, the piercing of the corporate veil in the case.[4] This totality of the circumstances approach also leads to a more informed balancing or weighing of the primary policy behind limited liability of the shareholder(s), specifically, a capital investment incentive, against the primary policy justifying piercing of the corporate veil, specifically, the avoidance of clearly inequitable consequences of not piercing. "This evidence must be analyzed in conjunction with evidence that a corporation

---

3. See, e.g., Associated Vendors, Inc. v. Oakland Meat Co., 210 Cal.App.2d 825, 838–40, 26 Cal. Rptr. 806, 813–15 (1962) (collecting cases); Barber, Piercing the Corporate Veil, 17 Willamette L.Rev. 371, 374–75 (1981). Associated Vendors is a forerunner of the modern cases analyzing the "totality of the circumstances" in order to pierce the corporate veil in a case involving an alleged breach of contract.

4. In discussing the concept of piercing the corporate veil to hold the parent corporation liable for the debts of its subsidiary corporation, the renowned Benjamin N. Cardozo, then Chief Judge of the New York Court of Appeals, remarked that this concept "is still enveloped in the mists of metaphor. Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it." Berkey v. Third Avenue Ry., 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).

attempted to use its corporate structure to perpetrate a fraud or do grave injustice on an innocent third party seeking to 'pierce the veil.'" *Southern Electrical Supply Co. v. Raleigh County National Bank,* 173 W.Va. 780, 788, 320 S.E.2d 515, 523 (1984).

■ Thus, in a case involving an alleged breach of contract, to "pierce the corporate veil" in order to hold the shareholder(s) actively participating in the operation of the business personally liable for such breach to the party who entered into the contract with the corporation, there is normally a two-prong test: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement). *See, e.g., Automotriz Del Golfo De California v. Resnick,* 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957) (en banc).[5] Most of the numerous factors listed previously are pertinent primarily to the disregard of formalities requirement, not because it is the more important requirement—it is not—but because it is easier to compile a list of typical corporate formalities than to anticipate and list types of inequitable and unfair consequences which could result from not piercing the corporate veil in a given case.[6]

In a breach of contract case many of the commentators and a few of the cases suggest that there may also be a third prong to the test for piercing the corporate veil which must be hurdled by certain types, and only certain types, of contract creditors of the corporation, specifically, those capable of protecting themselves. When, under the circumstances, it would be reasonable for that particular type of a party entering into the contract with the corporation, for example, a bank or other lending institution, to conduct an investigation of the credit of the corporation prior to entering into the contract, such party will be charged with the knowledge that a reasonable credit investigation would disclose. If such an investigation would disclose that the corporation is grossly undercapitalized, based upon the nature and the magnitude of the corporate undertaking, such party will be deemed to have assumed the risk of the gross undercapitalization and will not be permitted to pierce the corporate veil. In such a case that type of a sophisticated

---

**5.** The cause of action in the case now before us sounds essentially in contract. Therefore, we do not address here the question of what is required to pierce the corporate veil in a tort case. In note 13 of *Southern Electrical Supply Co. v. Raleigh County National Bank,* 173 W.Va. 780, 320 S.E.2d 515 (1984), this Court recognized that "[s]ome courts will more readily disregard a corporate form in cases of tort liability than in contract cases because contracts are voluntarily entered into with the corporate structure." 173 W.Va. at 787 n. 13, 320 S.E.2d at 522–23 n. 13.

**6.** Courts have discussed the significance of the disregard of formalities requirement. "The very nature of a closely held corporation militates against strict compliance with corporate formalities. However, the centralization of ownership is not a carte blanche to abrogate established procedure." *In re County Green Limited Partnership,* 438 F.Supp. 701, 707 (W.D.Va.1977), *rev'd on other grounds,* 604 F.2d 289 (4th Cir. 1979). In the latter opinion it was "note[d] that a single factor will rarely, if ever, be sufficient to justify the drastic remedy of piercing the corporate veil. The trier of fact should look at all the circumstances in each case rather than relying on any single factor." *Id.,* 604 F.2d at 292.

In the context of a close corporation, the failure to follow corporate formalities is important because the trier of the facts may reasonably infer that such conduct springs not from merely innocent, overworked inattention to paperwork by the sole or controlling shareholder, but is indicative of the fact that such shareholder views the business as his or her own individual business so that there is no need to "go through the motions" of complying with formalities:

Individuals who wish to enjoy limited personal liability for business activities under a corporate umbrella should be expected to adhere to the relatively simple formalities of creating and maintaining a corporate entity. In a sense, faithfulness to these formalities is the price paid for the corporate fiction, a relatively small price to pay for limited liability. Furthermore, the formalities are themselves an excellent litmus of the extent to which the individuals involved *actually view the corporation as a separate being....* It is clearly not necessary that all of these factors be present in a given case to justify piercing the veil.

*Labadie Coal Co. v. Black,* 672 F.2d 92, 96–97 (D.C.Cir.1982) (emphasis in original).

party dealing with the corporation should, and ordinarily would, also, or in lieu thereof, enter into a contract with the shareholder(s). *Cf. DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 686 n. 13 (4th Cir.1976) (contract creditors impliedly assume the risk of gross undercapitalization); *Hanson v. Bradley,* 298 Mass. 371, 380–82, 10 N.E.2d 259, 264–65 (1937) (fair inference is that salaried employee of corporation knew worthlessness of corporation when he entered into contract for salary). On the other hand, " 'the plaintiffs' lack of sophistication is equally tenable against the presumption [suggested by some commentators] that they [the plaintiffs as contract creditors] knowingly assumed the risk of the corporation's undercapitalization.' " *Labadie Coal Co. v. Black,* 672 F.2d 92, 100 (D.C.Cir. 1982), *quoting* Barber, *Piercing the Corporate Veil,* 17 Willamette L.Rev. 371, 386 (1981).

Generally, the presumption is that the party dealing with the corporation did not assume the risk of grossly inadequate capitalization. "[I]n entering into such [contractual] relationships with corporate entities the parties are [generally] entitled to rely upon certain assumptions, one being that the corporation is more than a mere shell—that it has substance as well as form." *Iron City Sand & Gravel Division of McDonough Co. v. West Fork Towing Corp.,* 298 F.Supp. 1091, 1099 (N.D.W.Va.1969), *rev'd on other grounds,* 440 F.2d 958 (4th Cir.1971). In other words, the incorporators who actively participate in the operation of the business are not entitled to personal immunity when they fail to provide the *quid pro quo* for

such immunity, specifically, a reasonably adequate capital fund to which creditors may resort. *See Hanson v. Bradley,* 298 Mass. 371, 380, 10 N.E.2d 259, 264 (1937).

Close corporations are closely scrutinized to determine whether the corporate veil should be pierced. *See Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73, 81 (Wyo.1982). One of the principal reasons for this close scrutiny of close corporations is that grossly inadequate capitalization is more likely to occur in a close corporation than in a corporation whose shares are publicly traded, and grossly inadequate capitalization is a very important factor, as an element of the fairness prong, in determining whether to pierce the corporate veil. "One fact which all the authorities consider significant in the inquiry [of whether to pierce the corporate veil], and particularly so in the case of the one-man or closely-held corporation, is whether the corporation was grossly undercapitalized for the purposes of the corporate undertaking." *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976). An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has, according to *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793, 803 (1944), frequently been an important factor in cases denying shareholders their defense of limited liability. *See also Labadie Coal Co. v. Black,* 672 F.2d 92, 99 (D.C.Cir.1982); *Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73, 80 (Wyo.1982). *See generally* annotation, *Inadequate capitalization as factor in disregard of corporate entity,* 63 A.L.R.2d 1051 (1959).[7]

---

**7.** An often quoted statement of the vital importance of grossly inadequate capitalization as a factor in determining whether to pierce the corporate veil is set forth in 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 44.1 (rev.perm.ed. 1983) (footnotes omitted):

If a corporation is organized and carries on a business without substantial capital in such a way that the corporation is likely to have insufficient assets available to meet its debts, it is inequitable that the stockholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibilities to creditors is an abuse of the separate entity and will be ineffectual to exempt the stockholders from corporate debts. It is coming to be recognized as the policy of the law that stockholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is ground for denying the separate entity privilege. It has been stated that a corporation's capitalization is a major consideration

The obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations. *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686 (4th Cir.1976). With respect to determining the adequacy of the corporation's capital, in light of the nature and magnitude of the corporate undertaking, there are several tests and factors which can be utilized to analyze the financial data of the corporation. For example, comparison with the capitalization of other corporations in the same or a similar line of business may be made. The capitalization of the corporation in question could be compared with the average industry-wide ratios (current ratio, acid-test ratio, debt/equity ratio, etc.) obtained from published sources (Dunn & Bradstreet, Moody's *Manual of Investments*, Standard and Poor's *Corporation Records*, etc.). These average ratios could be buttressed by expert testimony from certified public accountants, securities analysts, investment counselors or other qualified financial analysts. *See* Barber, *Piercing the Corporate Veil*, 17 Willamette L.Rev. 371, 392–94 (1981). "Grossly inadequate capitalization" for the purpose of piercing the corporate veil would generally be reflected by a substantial deficiency of capital compared with that level of capitalization deemed adequate in the case by the financial analyst experts.

It is clear that grossly inadequate capitalization combined with disregard of corporate formalities, causing basic unfairness, are sufficient to pierce the corporate veil in order to hold the shareholder(s) actively participating in the operation of the business personally liable for a breach of contract to the party who entered into the contract with the corporation. *See, e.g., Labadie Coal Co. v. Black*, 672 F.2d 92, 99–100 (D.C.Cir.1982); *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 687 (4th Cir.1976); *Automo-*

*triz Del Golfo De California v. Resnick*, 47 Cal.2d 792, 796–98, 306 P.2d 1, 4 (1957) (en banc); *Amfac Mechanical Supply Co. v. Federer*, 645 P.2d 73, 79–82 (Wyo.1982). "The essence of the fairness test is simply that an individual businessman [or business woman] cannot [be allowed to] hide from the normal consequences of *carefree* entrepreneuring by doing so through a corporate shell." *Labadie Coal Co. v. Black*, 672 F.2d 92, 100 (D.C.Cir.1982) (emphasis in original).

It is also clear that the propriety of piercing the corporate veil should rarely be determined upon a motion for summary judgment. Instead, the propriety of piercing the corporate veil usually involves numerous questions of fact for the trier of the facts to determine upon all of the evidence. *See Southern Electrical Supply Co. v. Raleigh County National Bank*, 173 W.Va. 780, 782 n. 5, 320 S.E.2d 515, 517 n. 5 (1984); *Wheeling Kitchen Equipment Co. v. R & R Sewing Center, Inc.*, 154 W.Va. 715, 719–20, 179 S.E.2d 587, 589–90 (1971); *Alorna Coat Corp. v. Behr*, 408 So.2d 496, 498 (Ala.1981) (motion to dismiss); *Curtis v. Vlotho*, 313 N.W.2d 469, 472 (S.D.1981) (trial court in nonjury trial improperly considered only the evidence on lack of fraudulent representation, without analyzing other factors for piercing corporate veil); *Amfac Mechanical Supply Co. v. Federer*, 645 P.2d 73, 74–77, 82 (Wyo. 1982) (motion to dismiss improperly granted in nonjury trial at close of plaintiff's evidence; trial court improperly relied exclusively on lack of fraud; prima facie case for piercing shown by evidence of grossly inadequate capitalization and disregard of corporate formalities).

"The question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." Syl.pt. 5, *Aetna Casualty & Surety Co. v. Federal Insurance Co.*, 148 W.Va. 160, 133 S.E.2d

of courts in deciding whether a legitimate separate corporate entity was maintained.
Several of the commentators suggest that grossly inadequate capitalization *per se* should be sufficient to pierce the corporate veil, except when a contract creditor capable of protecting

itself assumes the risk. *See, e.g.,* Gelb, *Piercing the Corporate Veil—The Undercapitalization Factor,* 59 Chi.Kent L.Rev. 1 (1982); Note, *Disregarding the Corporate Fiction in Florida: The Need for Specifics,* 27 U.Fla.L.Rev. 175 (1974).

**352**

770 (1963). In the case now before us, genuine issues of fact remained at the time of the defendants' motion for summary judgment, principally the question of whether there was grossly inadequate capitalization and whether there was a disregard of the numerous corporate formalities. The trial court did not consider the capitalization factor, and this opinion sets forth for the first time in this jurisdiction a list of the more common corporate formality factors which must be examined in order to impose liability on individual shareholders.[8]

Moreover, the trial court at the time of the motion for summary judgment in this factually complex case had the benefit of only the deposition of Ferns, the individual defendant, which deposition was taken by the plaintiffs. Summary judgment procedure should not be utilized in a factually complex case:

> In complex cases, the tendency on a summary judgment motion is to rely on the facts developed through discovery as constituting all of the relevant facts in the case. This may lead to inaccurate factual assessment. A party may often undertake very little discovery or limit the discovery to certain critical areas with the knowledge that he has the requisite proof available without the necessity of any further discovery. Frequently, discovery depositions of the parties or their key witnesses do not reflect all relevant facts. This is because these depositions are taken by adverse counsel and the deponents do not care to volunteer information and, therefore, they give limited answers to the questions. While discovery procedures are useful to develop the facts of a case, there is no

requirement that all facts must be developed through discovery, and certainly no grounds for the assumption that they have been developed by discovery.

The problem in the present case is that the trial court accepted the discovery depositions as constituting the entire factual case.

*Masinter v. WEBCO Co.*, 164 W.Va. 241, 243, 262 S.E.2d 433, 436 (1980).

Based upon all of the above, we reverse the order of the trial court granting the defendants' motion for summary judgment and remand this case for further proceedings consistent with the principles enunciated herein.

Reversed and remanded.

---

8. The posture of this case is almost identical to that in *Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C.Cir.1982):

> The determination of whether there was unfairness in this case, whether from undercapitalization or from some other aspect of [the case], was inadequately considered by the trial court in deciding that the veil could not be pierced. The entire picture of the relationship between [the parties], the representations made, the question of whether the corporation actually existed at that time, as well as

many of the factors listed in the formalities section of this discussion, should all be considered in the court's evaluation.

> ... Since the record is to be reopened, we do not speak as to the ultimate outcome. We do emphasize, however, that a corporation need not be a sham entity in an absolute sense to be ignored. We leave it to the [trial] court on the expanded record ... to make its own determination consistent with these guidelines.

672 F.2d at 100.