980 F.2d 727
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
IN RE: HUGHES CREEK, INCORPORATED, Debtor.
James K. KESSLER, Plaintiff-Appellant,
and
HUGHES CREEK, INCORPORATED, a West Virginia corporation, Plaintiff,
v.
John FALBO; Frank Falbo, coexecutors and personal
representatives of the estate of James Falbo,
deceased, Defendants-Appellees.
IN RE: HUGHES CREEK, INCORPORATED, Debtor.
James K. KESSLER, Plaintiff-Appellee,
and
HUGHES CREEK, INCORPORATED, a West Virginia corporation, Plaintiff,
v.
John FALBO; Frank Falbo, coexecutors and personal
representatives of the estate of James Falbo,
deceased, Defendants-Appellants.
 Nos. 91-1831, 91-1832.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 4, 1992
Decided: October 21, 1992
 
 1
 Appeals from the United States District Court for the Southern District of West Virginia at Charleston.
 
 
 2
 Argued: Ellen S. Cappellanti, Jackson & Kelly, Charleston, West Virginia, for Appellant.
 
 
 3
 Joshua I. Barrett, Ditrapano & Jackson, Charleston, West Virginia, for Appellees.
 
 
 4
 On Brief: M. Blane Michael, Jackson & Kelly, Charleston, West Virginia, for Appellant.
 
 
 5
 P. Rodney Jackson, Ditrapano & Jackson, Charleston, West Virginia, for Appellees.
 
 
 6
 S.D.W.Va.
 
 
 7
 AFFIRMED.
 
 
 8
 Before PHILLIPS and NIEMEYER, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 KAUFMAN, Senior District Judge:
 
 9
 Appellant/cross-appellee herein, James K. Kessler (Kessler) and Hughes Creek, Inc. (Hughes Creek), the latter a debtor in possession under Chapter 11 of the Bankruptcy Code,[1] instituted in March, 1987, an adversary proceeding against James Falbo and John Falbo in the United States Bankruptcy Court for the Southern District of West Virginia. In that action, Hughes Creek and Kessler sought (1) an avoidance pursuant to 11 U.S.C. § 544(a) of certain statutory liens claimed by James Falbo; (2) an avoidance under 11 U.S.C.s 547 of certain allegedly preferential transfers to James Falbo; (3) recovery of compensatory and punitive damages from James and John Falbo for common law fraud; (4) a declaratory judgment as to the terms of a certain lease between James Falbo and Hughes Creek; (5) recovery from James Falbo for the legal expenses and fees incurred by Hughes Creek in seeking the dismissal of a state court action commenced by James Falbo which violated the automatic stay provisions of 11 U.S.C. § 362; and (6) compensatory and punitive damages from James and John Falbo for securities fraud.[2] In response, James and John Falbo, appellees/cross-appellants herein, denied liability, requested a jury trial, and counterclaimed against Kessler and Hughes Creek, seeking recovery of unpaid rent with interest, and seeking compensatory and punitive damages against Kessler individually on the theory that Kessler abused the corporate identity of Hughes Creek.
 
 
 10
 By consent of the parties and pursuant to an Order dated March 22, 1989 entered by the United States District Court for the Southern District of West Virginia, this case was referred pursuant to 28 U.S.C.[3] § 157(c)(2) to Judge Friend, United States Bankruptcy Court Judge for the Northern District of West Virginia for trial upon Hughes Creek's and Kessler's common law fraud claims, Kessler's securities fraud claim, defendants' counterclaim, and for declaration of the terms of the lease between Hughes Creek and James Falbo. Those issues were tried in the bankruptcy court on April 11 and 12, 1989.[4] By Order dated May 2, 1989, the bankruptcy court directed a verdict in favor of Kessler on Falbo's counterclaim[5] in which the counterclaimant sought to pierce the corporate form of Hughes Creek and to hold Kessler individually liable for unpaid rent.[6] On August 2, 1989, the bankruptcy court filed Findings of Fact and Conclusions of Law, and entered a Judgement Order on August 9, 1989 with respect to the claims of Kessler and Hughes Creek. Judge Friend concluded that Falbo was liable to Kessler for common law fraud, but not for aiding and abetting securities fraud, and awarded Kessler only $200,000 of the $3,809,000 which Kessler sought to recover from Falbo for common law fraud. Judge Friend further concluded that Hughes Creek could not recover for common law fraud against Falbo.[7] The parties filed various motions to amend the bankruptcy court's findings of fact and conclusions of law and Judgment Order. The bankruptcy court denied all of those motions except that it did allow Kessler postjudgment interest on the latter's $200,000 award.
 
 
 11
 Hughes Creek, Kessler and Falbo timely appealed the Orders of bankruptcy court to the United States District Court for the Southern District of West Virginia. By Judgment Order dated September 25, 1991 and Memorandum Orders dated June 27, 1991 and September 5, 1991, United States District Judge Copenhaver affirmed the bankruptcy court's result, but awarded Kessler prejudgment interest as well as postjudgment interest with respect to the latter's $200,000 damage award.
 
 
 12
 In this appeal,[8] Kessler claims that the bankruptcy court erred by limiting his damages to $200,000 and by not finding that Falbo was an aider and abettor to securities fraud. James Falbo[9] cross-appeals, challenging the bankruptcy court's determinations that he committed common law fraud and that the corporate form of Hughes Creek should not be disregarded.
 
 
 13
 For the reasons set forth below, this Court affirms the district court.
 
 I.
 Facts
 
 14
 The following is a summary of the bankruptcy court's findings of fact which are relevant to this appeal.
 
 
 15
 Until the early 1980's, Kessler operated a successful coal business, Kessler Coals, Inc., in Boone County, West Virginia. Kessler met Harold Osborne (Osborne),[10] whose actions figure prominently in this suit, in 1979 when Osborne worked as the resident manager of a contract miner engaged by Kessler. On one occasion, Osborne's employer was seeking to procure a more favorable mining contract from Kessler and asked Osborne to testify against Kessler in order to forward that aim. Osborne refused so to testify and, as a consequence, was fired from his job. In 1981, Osborne became the sole owner of a coal mining company, Greendale Coals (Greendale), and in that same year, Kessler, remembering Osborne's past support, guaranteed loans for Osborne in the amount of $600,000 in connection with Greendale's lease of a large tract of land in Clay and Nicholas counties in West Virginia.[11] On October 5, 1984, Osborne organized another coal industry company of which he was the owner of all interests and of which he was president. That company was Hughes Creek, which was formed to develop a river dock facility for loading coal. James Falbo, an experienced businessman, and Osborne, as president of Hughes Creek, entered into a lease on September 15, 1984 of a tract of land which Falbo owned and upon which Hughes Creek was to install and operate its loading facility. That lease was prepared by Falbo's attorney and called for an annual minimum rental of $250,000 per year and did not contain a purchase option. Under that lease, Osborne was required to pay $200,000 of the minimum rent on January 15, 1985, and the remaining $50,000 by October 1, 1985.
 
 
 16
 In 1984, Osborne had negotiated with Lawson Hamilton (Hamilton) to provide financial backing for Hughes Creek. Hamilton did invest some money in Hughes Creek, but not the full amount for which Osborne had been negotiating. In late 1984, Kessler, at Osborne's request, spoke to Hamilton about making a larger investment in Hughes Creek, but failed to convince Hamilton to do so. However, subsequently, on May 22, 1985, Kessler himself agreed to purchase, for $1,200,000, 51% of the outstanding shares of stock of Hughes Creek upon certain conditions, one of which was the presentation to him of a full force and effect certificate signed by Falbo stating that Osborne was not in default in connection with his lease with Falbo and that that lease was in full force and effect. Before agreeing so to invest in Hughes Creek, Kessler also asked to see the lease on the property rented from Falbo. In response, Osborne mailed Kessler a copy of a "fake" lease upon which Osborne forged Falbo's signature and which set forth much better terms than did the true lease between Osborne and Falbo. For example, the "fake" lease required only an annual minimum rental of $150,000, none of which was due in 1985, and an option to purchase the property for $1.2 million. By subsequent representations, Osborne also led all of the employees of Hughes Creek, including the company's book-keeper, accountant, and in-house lawyer, to believe that the "fake" lease was the operative lease for the premises. The forged lease stated that an executed memorandum of that lease was to be recorded; but such recordation never took place. Prior to Kessler's agreement to purchase the Hughes Creek shares, Kessler's attorney performed a title search which indicated that no lease for Falbo's property had been recorded.
 
 
 17
 In order to obtain Falbo's signature on the full force and effect certificate concerning the lease, Osborne told Falbo that if the latter signed the document, Osborne would pay Falbo the money which was due and owing to Falbo under the lease. That certificate was handwritten by Osborne and read as follows:
 
 May 22, 1985
 
 18
 The undersigned Lessor James Fabo [sic], under that certain lease dated September 15, 1984 between James Fabo[sic] and Harold Osborne does hereby certify that the lessee has fully performed his obligations under the lease to date hereof there are no present defaults under the lease and the lease is now in full force and effect.
 
 
 19
 /s/ James Falbo
 
 
 20
 /s/Harold Osborne /s/Harold Osborne Hughes Creek, Inc. President
 
 
 21
 When presented with that handwritten document for signature on May 22, 1985, Falbo had been holding a $200,000 check from Osborne since January 28, 1985. Osborne had asked Falbo to hold that check without cashing it, in return for Osborne's promise to pay to Falbo twelve and one-half percent interest on the $200,000 on February 14, 1985 and March 15, 1985, which Osborne did. Falbo signed the certificate on May 22, 1985. Thereafter on May 31, 1985, Osborne paid Falbo $100,000, and then on October 8, 1985 made another $100,000 payment to Falbo. Although Falbo did not meet Kessler until after May, 1985, Falbo admits that he knew soon after the lease was signed in September, 1985 that Kessler was involved with Hughes Creek and admits that he was aware that Osborne's $100,000 payments came from Kessler's investment in Hughes Creek.
 
 
 22
 Upon Kessler's purchase of 51% of Hughes Creek's outstanding shares of stock on May 22, 1985, Kessler became the sole director and chairman of the board of Hughes Creek, while Osborne remained president and treasurer. Kessler subsequently loaned Hughes Creek a further $2,609,000, bringing the total of Kessler's investment in Hughes Creek to $3,809,000. Although Kessler was empowered to make general policy decisions for Hughes Creek and to authorize investments and loans, Kessler gave to Osborne authority to make deals on the company's behalf and to manage the company on a dayto-day basis. The accountant, secretary, in-house lawyer, and other employees of Hughes Creek all believed that Osborne was in charge of the corporation and was not limited in his authority. Further, the impression of the general public was that Osborne had full authority to transact business for Hughes Creek.
 
 
 23
 By the end of 1985, Osborne was $300,000 in arrears in his payments to Falbo under the terms of the true Hughes Creek lease. In January, 1986, Osborne, as president of Hughes Creek, entered into a payment plan agreement with Falbo under which Hughes Creek was to pay what it owed to Falbo in certain installments. After the first installment payment which it made in February, 1986, Hughes Creek failed to make any further payments under that agreement. It was not until January, 1987, however, that Kessler discovered, upon being told by Osborne, that the operative lease was not the forged lease. Eventually, Falbo cancelled the lease with Hughes Creek, and Hughes Creek filed for Chapter 11 bankruptcy. Under the terms of the forged lease, Hughes Creek did not owe Falbo any money for rent; however, under the true lease, $434,871.89 in minimum annual rent was due and owing to Falbo through March, 1989.
 
 II.
 Standards of Review
 
 24
 The district court reviewed the bankruptcy court's findings of fact under a clearly erroneous standard, In re Club Associates, 951 F.2d 1223, 1228 (11th Cir. 1992), and could reverse those findings only if upon examining "the entire record [it was] left with the definite and firm conviction that a mistake ha[d] been made." In re Morris Communications NC, Inc., 914 F.2d 458, 467 (4th Cir. 1990). See also Bankruptcy Rule 8013; Lowe's of Virginia, Inc. v. Thomas, 60 B.R. 418, 419 (W.D. Va. 1986). The bankruptcy court's conclusions of law, however, were subject to de novo review by the district court. In re Club Associates, 951 F.2d at 1228-29; In re Morris Communications NC, Inc., 914 F.2d at 467. In reviewing the bankruptcy court's determinations, we employ the same standards as the district court[12] below. In re Club Associates, 951 F.2d at 1228.
 
 III.
 Common Law Fraud
 
 25
 The bankruptcy court concluded that Falbo was liable to Kessler for common law fraud because, by signing the handwritten document dated May 22, 1985, Falbo misrepresented that Hughes Creek was current in connection with payment of rent when in fact Hughes Creek was $200,000 in arrears in that regard. The bankruptcy court found that Kessler had proved by a preponderance of the evidence all of the elements of common law fraud, that is, that the representations in the certificate signed by Falbo were material and false or misleading, that Kessler reasonably relied upon that certificate in believing that Hughes Creek was current in connection with rental payments under its lease with Falbo, that Kessler was within the class of persons whom Falbo could have expected to rely upon the certificate, and that Kessler was damaged by his reasonable reliance. However, the bankruptcy court rejected Kessler's argument that Falbo's misrepresentation misled Kessler into believing that the forged lease was the true lease or prevented Kessler from discovering the existence of the true lease, and did not award to Kessler any amount in addition to the $200,000 of rent. The district court affirmed the bankruptcy court's finding of fraud, its award of $200,000 plus postjudgment interest, and its refusal to award any further damages to Kessler.[13] Kessler challenges the limitation of the award to $200,000 in this appeal arguing that he would not have bought shares of stock in Hughes Creek but for Falbo's signature on the full force and effect certificate, and that he therefore should be able to recover the total amount of money which he invested in Hughes Creek, namely, $3,809,000 plus the $200,000 rent. Cross-appealing on the fraud issue, the executors of James Falbo's estate claim that Falbo made no actionable misrepresentation to Kessler because (1) the handwritten certificate which Falbo signed did not include a false statement, (2) even if that certificate was false and/or misleading, Kessler failed to prove by clear and convincing evidence that Falbo had the requisite knowledge to warrant a finding of fraud, (3) Kessler was not within the class of persons whom Falbo intended to rely upon that certificate, and (4) Kessler failed to prove the amount of damages allegedly proximately caused by Falbo's statement.
 
 
 26
 Under West Virginia law, Kessler had to prove the following elements in order to prevail upon his fraud claim, namely that (1) Falbo made the fraudulent representation at issue or induced some one else to make such a representation; (2) the representation was false and material; (3) under the circumstances of the case, Kessler justifiably relied upon that representation; and (4) Kessler was damaged by his reliance upon that representation. Lengyel v. Lint, 280 S.E.2d 66, 69 (W. Va. 1981). See also White v. Nat'l Steel Corp., 938 F.2d 474, 490-91 (4th Cir. 1991).
 
 
 27
 Appellee argues that on May 22, 1985, Falbo truthfully signed the handwritten full force and effect certificate because Falbo, as lessor, was the one to determine whether or not the lease was current and Falbo reasonably believed that Osborne would make good the $200,000 check which Falbo was holding. The bankruptcy court concluded that the certificate was false because"the holding of a $200,000 check dated January 28, 1985, until May 22, 1985, which was due by the terms of the lease on January 15, 1985, is a condition of default."[14] We agree. Further, even if Osborne was not technically in default under the lease and the lease was still in full force and effect, the statement in the certificate that "the lessee has fully performed his obligations under the lease to date" was, under the uncontroverted facts of this case, not true because Osborne had failed to pay Falbo $200,000 by January 15, 1985, as required by the terms of the lease.
 
 
 28
 Appellee further contends that Kessler did not adduce sufficient proof of scienter to prevail upon his fraud claim. Under West Virginia law, the
 
 
 29
 "existence of [actual] fraud is not deducible from facts and circumstances which would be equally consistent with honest intentions. In sum, a presumption always exists in favor of innocence and honesty in a given transaction and the burden is upon one who alleges fraud to prove it by clear and distinct evidence."
 
 
 30
 White, 938 F.2d at 490 (quoting Steele v. Steele, 295 F. Supp. 1266, 1269 (S.D.W. Va. 1969) (citation omitted)). Nonetheless, the Supreme Court of Appeals of West Virginia has clearly stated:
 
 
 31
 [i]t is not essential that the defendant know for a fact that the statement or act alleged to be fraudulent is false. An action for fraud may lie where the defendant either knows the statement to be false, makes the statement without knowledge as to its truth or falsity, or makes it under circumstances such that he should have known of its falsity.
 
 
 32
 Lengyel, 280 S.E.2d at 69.
 
 
 33
 The bankruptcy court concluded that "Falbo issued the certificate when he knew it was false or without regard to its truth or falsity."[15] Applicable West Virginia case law and the record amply support that determination and the district court's affirmance of the bankruptcy court's conclusion that Falbo signed the certificate with the state of mind necessary to be liable for fraud. At the time of Falbo's signature, Osborne had owed Falbo, for almost five months, approximately $200,000 on the lease. Moreover, Falbo's uncontested behavior after signing the certificate indicated that Falbo knew that his signing of the certificate was not right. At trial in the bankruptcy court, Falbo testified that two hours after he had signed the handwritten certificate he began to have mis givings about the certificate, telephoned Osborne, asked him to return it, and then, upon its receipt, tore up the certificate.[16]
 
 
 34
 No West Virginia case has been cited to this Court with regard to whether Kessler is within the group of persons who are entitled to relief by way of a cause of action for Falbo's misrepresentation. We believe it more than likely, however, that the West Virginia courts would follow the general rule articulated in the Restatement that
 
 
 35
 [o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.
 
 
 36
 Restatement (Second) of Torts § 531 (1976). Under the Restatement, the defendant "must have information that would lead a reasonable man to conclude that there is an especial likelihood that [the misrepresentation] will reach those persons and influence their conduct," however, the defendant need not "know the identity of the person whom [the misrepresentation] will reach or indeed of any individual in the class." Id., comment d, e at 68.
 
 
 37
 The bankruptcy court, concluding that Kessler was within the class of persons whom Falbo had reason to expect would act upon the certificate, wrote: "Falbo knew the certificate was to be used to generate funds. Kessler was a person within the scope of interests that Falbo could expect to rely upon the certificate-an investor."[17] With regard to signing the May 22, 1985 certificate, Falbo testified:[18]
 
 
 38
 And [Osborne] said, 'Jim, got your money down there, Kanawha Valley Bank got your money. All you've got to do is sign right here, and we'll go down and get it.' Well, all I could think about was my two hundred thousand dollars ($200,000.00), getting that check and giving it back to him and getting my money.
 
 
 39
 ....
 
 
 40
 [Osborne] said he needed the piece of paper to get my money.[19]
 
 
 41
 Falbo's own testimony reveals that his obtaining of the money was conditional upon his signing the certificate. Under those circumstances, it was more than likely that Osborne planned to use the handwritten certificate to procure some sort of financing and thereby finally pay Falbo. The record also indicates that Falbo knew that Osborne was in a bad financial shape and needed backing.[20] In addition, Falbo testified that he knew that the first $100,000 payment he received from Osborne in May, 1985 probably came from Kessler.
 
 
 42
 Q.Did [Osborne] tell you where the money had come from for this hundred thousand dollars ($100,000.00), the first one that you got at the end of May '85?
 
 
 43
 A.Well, now, I believe he told me it come from Kessler. I just can't remember for sure, but I believe that's what he told me. I don't know any other place he was getting money from. You know, it began getting around that Kessler was backing him.[21]
 
 
 44
 Thus, the evidence supports the bankruptcy court's determinations that Kessler was within the "class of persons whom [Falbo] ... ha[d] reason to expect to act or to refrain from action in reliance upon the [certificate]." Restatement (Second) of Torts § 531.
 
 
 45
 With regard to the amount of Kessler's damages, the bankruptcy court concluded that Kessler justifiably relied upon the certificate's representation that there were no rental payments due under the lease and that Kessler therefore could recover to the extent that rental payments were owing pursuant to the lease, i.e. in the amount of $200,000. However, the bankruptcy court found-and the district court agreed-that Falbo's assurance that the lease was not in default and Falbo's failure to reveal that Hughes Creek owed him $200,000 in rent, did not prevent Kessler from learning that a different lease had in fact been executed. Kessler points out that under the lease which he reviewed, the rental payments were $150,000 and no rental payments would have been due as of the date upon which the certificate was signed. Accordingly, Kessler asserts that if Falbo had revealed that the lease was in default, Kessler would have been alerted to the fact that the lease which he had seen was not the operative lease, and he would not have invested in Hughes Creek. In essence, Kessler contends that Falbo's misrepresentation deprived Kessler of the opportunity to inquire further with regard to the true terms of the lease and to determine that the lease he had seen was forged; and that thus he was deprived of information which would have led him not so to invest.
 
 
 46
 As in the case of any other tort, a claimant alleging misrepresentation may recover only for those damages which are proximately caused by the defendant's wrongdoing. The Restatement provides that the fraud for which plaintiff "is entitled to recover ... damages ... [is] the pecuniary loss to him of which the misrepresentation is a legal cause." Restatement (Second) of Tortss 549. "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Id. § 548A. In other words, as the bankruptcy court noted, "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."[22] "In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." Id., comment a at 107. See also Brandenburg v. Seidel, 859 F.2d 1179, 1189-90 (4th Cir. 1988). However, only the general type or category of harm need be foreseeable, not "the precise injury, or the precise chain of events leading to the injury." Frye v. McCrory Stores Corp., 107 S.E.2d 378, 385 (W. Va. 1959); Prosser, Law of Torts, § 43 at 299 (5th ed. 1984). See also Garrett v. United States, 501 F. Supp. 337, 339 (N.D. Ga. 1980).
 
 
 47
 In our view, there is ample support for the finding of the bankruptcy court-and the adoption thereof by the district court that the certificate which Falbo signed did not make any representations with regard to the specific terms of the lease and thus hardly provided a reasonable basis for Kessler to be persuaded to invest a sum such as $3,809,000 in 51% of the outstanding stock of Hughes Creek. That conclusion is buttressed by the fact that the forged lease specifically stated that that lease would be recorded and that the title search thereafter performed by Kessler's attorney revealed, contrary to that statement, no recordation of any lease on Falbo's property. Given the results of that title search, Kessler could-and as a seemingly sophisticated business man, should-have inquired further before investing. Thus, Kessler's purported reliance (upon the truth of what was stated in the certificate for verification of the identity of the actual lease), in purchasing the Hughes Creek stock for a large sum of money, was hardly reasonable.
 
 IV.
 Aiding and Abetting
 
 48
 The three general elements for establishing liability for aiding and abetting in violation of Rule 10b-5 of the Securities Exchange Commission are:
 
 
 49
 (1) a primary violation by another person; (2) the aider and abettor's "knowledge" of the primary violation; and (3) substantial assistance by the aider and abettor in the achievement or consummation of the primary violation.
 
 
 50
 Schatz v. Rosenberg, 943 F.2d 485, 495 (4th Cir. 1991). See also Metge v. Baehler, 762 F.2d 621, 624 (8th Cir. 1985). The bankruptcy court found that Falbo was not such an aider and abettor with respect to Kessler's purchase of the Hughes Creek stock, because Falbo did not know about the forged lease or Osborne's use of that lease to get Kessler to purchase Hughes Creek stock. The bankruptcy court emphasized that Falbo signed the full force and effect certificate merely to get his $200,000.
 
 
 51
 This Court first notes that the second prong in Schatz specifies that the alleged aider and abettor must have " 'knowledge' of the primary violation." Id. (emphasis added). See also Bane v. Sigmunder Exploration Corp., 848 F.2d 579, 581 (5th Cir. 1988) ("the aider and abettor must have had a 'general awareness' of its role in a Rule 10b-5 violation"); Woods v. Barnett Bank of Fort Lauderdale, 765 F.2d 1004, 1009 (11th Cir. 1985) ("the surrounding circumstances and expectations of the parties [are] critical, because knowledge of the existence of a violation must usually be inferred."). This Court has stated, moreover, that "[w]hen there is no duty running from the alleged aider and abettor to the plaintiff, the defendant must possess a 'high conscious intent' and a 'conscious and specific motivation' to aid the fraud." Schatz, 943 F.2d at 496 (citations omitted). The record in this case does not indicate that a special relationship existed between Falbo and Kessler, or any other fact which might have created a duty running from Falbo to Kessler.[23]
 
 
 52
 Even assuming that Osborne committed a securities violation and that the first prong under Schatz is satisfied, this Court agrees with the conclusion of the bankruptcy court that the second prong of Schatz was not met because Falbo had no knowledge of the forged lease or of Osborne's security violation which centered around Osborne's use of the forged lease.
 
 V.
 Piercing the Corporate Veil
 
 53
 At trial, Falbo counterclaimed against Kessler personally for unpaid rents in connection with the Hughes Creek lease on the ground that Kessler abused the corporate entity of Hughes Creek and hence could no longer seek the protection of that corporate form. After hearing all of the evidence presented by both sides at trial, the bankruptcy court dismissed that counterclaim, stating generally that Falbo did not provide sufficient evidence to enable Falbo to pierce the corporate veil of Hughes Creek and so to reach Kessler.[24]
 
 
 54
 West Virginia courts have recognized that the liability of a principal shareholder to a third party who has dealt with the corporation is limited and that "a corporation and its shareholder(s) are presumed to be separate legal entities." Laya v. Erin Homes, Inc., 352 S.E.2d 93, 97 (W. Va. 1986). Thus, only
 
 
 55
 [u]nder exceptional circumstances, the corporate entity may be disregarded to remove the barrier to personal liability of the shareholder(s) actively participating in the operation of the business. "Justice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience or justify wrong. However, the corporate form will never be disregarded lightly."
 
 
 56
 Id. (quoting Southern States Coop., Inc. v. Dailey, 280 S .E.2d 821, 827 (1981). Under West Virginia law, an equity-based"totality of circumstances" test governs whether the corporate veil of a particular corporate entity should be pierced. Laya, 352 S.E.2d at 99. Many factors-and the specific facts of each case-may be looked to in applying that test. Id. at 98-99. However, in order to find the shareholder(s) personally liable, two requirements must generally be met:
 
 
 57
 (1) there must be such unity of interest and ownership that the separate personalities of the corporation and of the individual shareholder(s) no longer exist (a disregard of formalities requirement) and (2) an inequitable result would occur if the acts are treated as those of the corporation alone (a fairness requirement).
 
 
 58
 Id. at 99. In that context, "close corporations are closely scrutinized ...," particularly if they appear to be inadequately capitalized. Id. at 100-01. However, because the issue of whether to pierce the corporate veil is a factual one, the fact-finder's determination in that regard is accorded deference and may be reversed only if it is clearly erroneous. See Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 65 (4th Cir. 1989).
 
 
 59
 On appeal, in urging this Court to reverse the bankruptcy court's refusal to hold Kessler personally liable and the district court's adoption of that decision, appellee stresses the relation ship between Kessler and Greendale Coals and asserts that Kessler knowingly allowed Osborne to use Hughes Creek to advance the interests of Kessler, Osborne and Greendale. In support of that position, appellee contends that there were two common officers of Hughes Creek and Greendale, and that those two corporations shared office space, accountants and attorneys; that Kessler became involved with Hughes Creek to recover on his $600,000 guarantee of loans made to Osborne from others in connection with the affairs of Greendale; and that Kessler allowed Osborne to have full reign over Hughes Creek. Appellee further argues that Kessler used Hughes Creek as a conduit for a loan to Greendale Coal of 1.1 million dollars in November, 1985; that Hughes Creek treated Greendale favorably in some of the transactions between the two companies; and that Hughes Creek was undercapitalized. However, the record does not establish that there was such a unity of interest and ownership between Hughes Creek and Greendale so as to compel the conclusion that Hughes Creek was used by Kessler as a mere conduit for Greendale's enrichment. Kessler owned no stock or interest in Greendale and was not an officer or manager of that company. Kessler merely loaned Greendale $600,000.[25] Seemingly, there was no unity of interest and ownership between Kessler and Greendale. Nor, apparently, was there clear unity of interest, ownership or management between Hughes Creek and Kessler. There is nothing to support that Kessler commingled his funds with those of Hughes Creek, or diverted funds of Hughes Creek for his own personal use. Also, the record suggests that once Kessler became the 51% owner of Hughes Creek, corporate formalities with respect to stock issuance, meetings, and minutes were observed.
 
 
 60
 Accordingly, this Court concludes that the bankruptcy court-and the district court-did not err in determining that the corporate form of Hughes Creek would not be disregarded so as to hold Kessler personally liable for rents unpaid by Hughes Creek in connection with its lease with Falbo.
 
 AFFIRMED
 
 
 [1]
 Hughes Creek, a company incorporated under the laws of West Virginia and with its principal place of business in West Virginia, filed a petition for reorganization under Chapter 11 of Title 11 of the United States Code in February, 1987
 
 
 [2]
 Frank and John Falbo are each citizens of West Virginia and are coexecutors and personal representatives of the estate of James Falbo, deceased. See n.9 infra. James Falbo was a citizen of West Virginia. Kessler, herein the sole appellant/cross-appellee, alleged that John Falbo acted at all relevant times as an agent of James Falbo
 
 
 [3]
 Section 157(c) of Title 28 states in pertinent part:
 (1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11 . In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
 (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review [by the district court] under section 158 of this title.
 28 U.S.C. § 157(c)(1), (2) (1988).
 
 
 [4]
 Plaintiffs waived their jury trial demand, and all parties agreed to trial by the bankruptcy court
 
 
 [5]
 By agreement of the parties, the complaint of Kessler and Hughes Creek against John Falbo was dismissed, without prejudice, by the bankruptcy court on April 12, 1989
 
 
 [6]
 The bankruptcy court, however, granted the counterclaim of Falbo against Hughes Creek, awarding Falbo an amount equal to the rent due and accruing under the September 15, 1984 lease which Falbo and Harold Osborne, president of Hughes Creek, signed, as modified by a further written agreement between Falbo and Osborne dated January 26, 1986. The bankruptcy court's award of unpaid rent to Falbo against Hughes Creek has not been challenged in this appeal
 
 
 [7]
 Upon appeal by Hughes Creek, the district court affirmed the bankruptcy court's conclusion that Falbo was not liable to Hughes Creek for common law fraud. Hughes Creek has not appealed to this Court, any of the determinations of the district court or of the bankruptcy court
 
 
 [8]
 This Court has jurisdiction over the instant appeal pursuant to 28 U.S.C. § 158(a), (d) (1988)
 
 
 [9]
 Subsequent to the filing of his appeal, James Falbo died. John and Frank Falbo, coexecutors of James Falbo's estate, were substituted in his place as parties to this appeal
 
 
 [10]
 Invoking his Fifth Amendment right against self-incrimination, Osborne refused to testify in the adversary proceeding in the bankruptcy court
 
 
 [11]
 Kessler did not own any interest in Greendale; rather, Osborne owned all interests in that company
 
 
 [12]
 We recognize, however, that"[a] district court's conclusion that a bankruptcy court's factual finding is not 'clearly erroneous' is normally entitled to some persuasive weight." In re Sublett, 895 F.2d 1381, 1384 n.5 (11th Cir. 1990). See also In re Club Associates, 951 F.2d at 1228
 
 
 [13]
 The district court also concluded that Kessler was entitled to prejudgment interest as a matter of law. The district court determined that the postjudgment interest would accumulate, at the rate of 7.75% per annum commencing on August 3, 1989 until paid, on the aggregate amount of $271,512.72, an amount representing the award of $200,000 plus prejudgment interest of $71,512.72
 
 
 [14]
 Findings of Fact and Conclusions of Law at 19 (Aug. 12, 1989)
 
 
 [15]
 Findings of Fact and Conclusions of Law at 19
 
 
 [16]
 Joint Appendix at 630. Osborne, however, copied the certificate before returning the original to Falbo. Osborne provided a copy to Kessler's attorney
 
 
 [17]
 Findings of Fact and Conclusions of Law at 20
 
 
 [18]
 Only the deposition testimony of James Falbo was and is available for consideration
 
 
 [19]
 Trial transcript, Vol. II, p. 173, 176
 
 
 [20]
 Joint Appendix at 636-40
 
 
 [21]
 Joint Appendix at 200
 
 
 [22]
 Findings of Fact and Conclusions of Law at 24
 
 
 [23]
 We note, however, that in some cases "[s]evere recklessness can satisfy the scienter requirement in an aiding and abetting case, at least where the alleged aider and abettor owes a duty to the defrauded party." Woods, 765 F.2d at 1010 (emphasis added); Metge, 762 F.2d at 625 n.1
 
 
 [24]
 In so doing, it appears from the record on appeal that the bankruptcy court did not make any findings of fact specifically related to that determination. However, other findings of fact by the bankruptcy court do support that determination
 
 
 [25]
 Although Kessler might have initially invested $1,200,000 in Hughes Creek for the purpose of recouping his $600,000 loan to Osborne, it would hardly appear probable that Kessler, as an experienced and successful businessman, invested $3,809,000 in Hughes Creek for the purpose of recovering his $600,000 loan to Osborne for the Greendale lease