LUTTIG, Circuit Judge,
dissenting:
Section 523(a)(4) of the Bankruptcy Code provides that any debt “for fraud or defalcation while acting in a fiduciary capacity” is non-dischargeable in Chapter 7. The majority agrees that the Ellisons owed no fiduciary duty to ARC. From that premise, it unavoidably follows that the district court’s decision holding the Elli-sons’ debt to ARC non-dischargeable under this provision of section 528(a)(4) must be reversed. As I will explain below, the only defensible construction of the above-quoted provision is that the debt must have been incurred while the debtor was acting in a fiduciary capacity with respect to the creditor seeking to take advantage of section 523(a)(1). If there was no fiduciary duty owed by the debtor to the creditor, then section 523(a)(4) simply does not apply-
In its tortured path to the opposite conclusion, the majority creates a new avenue to non-dischargeability under section 523(a)(4). As I can best understand it, a debtor may be barred from discharging a debt in Chapter 7 if he owes a fiduciary duty to a corporation other than the creditor; that corporation, in turn, owes a fiduciary duty to the creditor seeking to invoke section 523(a)(4); the corporation commits defalcation while acting in a fiduciary capacity with respect to that creditor; the debtor “brings about” or “controls” that corporation’s defalcation; the debtor simultaneously breaches a fiduciary duty owed to the corporation (but does not necessarily commit fraud or defalcation with respect to that corporation); and, last but not least, the debtor is a guarantor of that corporation’s debts.[1]
I would confine the scope of section 523(a)(4) to its text and reverse the district court’s judgment.
I.
I begin with the principle upon which we all agree — that the Ellisons owed no fiduciary duty to ARC. While the parties concede (and the majority holds) that Sovereign World Travel was “acting in a fiduciary capacity” with respect to ARC,[2] the *275 Ellisons’ personal guarantee of Sovereign Travel’s obligations in no way imputes Sovereign Travel’s “fiduciary capacity” to the Ellisons. The majority correctly rejects the notion that a guarantor of a fiduciary’s debts himself becomes a fiduciary by virtue of the guarantee agreement. See ante, at 270. A guarantee agreement is nothing more than a promise to answer for the payment of another’s debt; it does not entail fiduciary obligations of any sort. Although Sovereign Travel may have been acting in a fiduciary capacity with respect to. ARC, its guarantors were not.
Nor did the Ellisons become ARC’s fiduciaries by virtue of their status as officers or as shareholders of Sovereign Travel. See In re Long, 774 F.2d 875, 878 (8th Cir.1985) (holding that corporate officers are not charged with the corporation’s fiduciary duties, in the absence of a state law rule creating fiduciary status in the officer). Officers and shareholders are not vicariously liable for the fiduciary obligations of their corporation, even if they “control” a corporation’s ability to satisfy those obligations, unless there is reason to disregard the corporate form. Whether a court should “pierce the corporate veil” is a question of state law, and no argument or evidence in the record suggests that the Ellisons operated Sovereign Travel as a shell corporation, without observing the corporate forms, in an effort to defraud their creditors. In the absence of these circumstances, the officers of a corporate fiduciary do not themselves become fiduciaries.
The only other possible source of a fiduciary duty to ARC is the Ellisons’ conduct. The majority hints that West Virginia tort law would hold the Ellisons directly and personally liable for their corporation’s debt, see ante at 271, although this issue was never briefed or argued. (If the majority really believed that the Ellisons’ debt to ARC arose under West Virginia tort law, there would be no need to rely on the Ellisons’ guarantee among its “confluence” of reasons for affirming the non-dischargeability order under section 523(a)(4); indeed, there would be no need to discuss the Ellisons’ guarantee agreement at all.) But even if the Ellisons committed a business tort under West Virginia law, that still would not establish that the Ellisons owed a fiduciary duty to ARC.
II.
Notwithstanding the absence of a fiduciary duty to ARC, the majority concludes that the Ellisons “act[ed] in a fiduciary capacity” under section 523(a)(4) because they owed a fiduciary duty to their corpo *276 ration, Sovereign Travel. See ante, at 271. This construction of the statute is indefensible. If a fiduciary duty to someone other than the creditor is sufficient to satisfy the “acting in a fiduciary capacity” requirement of section 524(a)(3), then any creditor in bankruptcy can render his debt non-dischargeable by characterizing the debtor’s actions as “fraud or defalcation,” so long as, at the time the debt accrued, the debtor owed a fiduciary duty to someone else — anyone else. Any failure to pay a creditor, whether on a contract or an adverse court judgment, could be characterized as a “defalcation,”[3] once section 524(a)(8) is divorced from its requirement that the debtor owe a fiduciary duty to the creditor and commit an act of defalcation while acting in that fiduciary capacity. The majority’s construction of section 523(a)(4) could exempt all of a fiduciary’s debts from discharge in bankruptcy, even those debts incurred entirely apart from his duties as a trustee.
The alternative (and only sensible) construction of the nondischargeability provision would require that the debtor have “act[ed] in a fiduciary capacity” with respect to the creditor. On this reading ARC, of course, cannot prevail because even the majority agrees that the Ellisons owed no fiduciary duty to ARC. Yet the majority rejects this construction of the statute, and then attempts to confine the absurd results that would follow from its own interpretation of the “acting in a fiduciary capacity” requirement by adding additional (and non-textual) factors in determining whether creditors in ARC’s position can establish non-dischargeability under section 523(a)(4). See ante, at 271-72.
What appears to underlie the majority’s decision is a concern that unscrupulous corporate officers might pilfer assets from corporate-controlled trust funds and then escape liability by filing for bankruptcy and «hiding behind the corporate form. Perhaps the majority believes this is what the Ellisons are trying to do to ARC, as the opinion repeatedly labels the Ellisons’ conduct as “wrongful,” notwithstanding the Bankruptcy Court’s explicit finding that “there is no evidence that the [Ellisons] committed actual fraud,” J.A. at 308, and the lack of any findings of fact or evidence in the record to suggest moral culpability on the part of the Ellisons.[4]
But even assuming that the majority’s grim characterization of the Ellisons’ conduct is accurate, its declaration that granting a discharge would be at odds with the “purpose” of section 523(a), see ante at 271-72 (preventing debtors from “avoiding ... the consequences of their wrongful conduct”) cannot justify ignoring the only plausible construction of the statute’s text *277 in favor of the new judicially-created multi-factored nondischargeability provision. An equal but opposite “purpose” that could be gleaned from section 523(a) (as well as the rest of the Bankruptcy Code and the case law) is the policy of giving the debtor a “fresh start.” It seems to me that this “purpose,” no less than the one chosen by the majority, should guide interpretation of section 523(a). It is no answer to say the fresh start policy is conferred only on those who incurred their debts through “non-wrongful” conduct, as debts from all sorts of “wrongful conduct” are discharge-able under section 523(a)(4) in the name of giving the debtor a fresh start.
This nicely illustrates the pitfalls of attempting to construe statutes in accordance with a perceived statutory “purpose.” Not only can multiple “purposes” be gleaned from a long and intricate statute such as the Bankruptcy Code, but courts have no principled basis for choosing among them. A legislative compromise has already resolved the competing policy concerns of giving the debtor a fresh start without letting people off the hook for, and therefore encouraging, “wrongful conduct.” A court’s task is to implement this compromise by applying the plain meaning of the statute, unadorned by divinations of statutory “purpose.”
In any event, the majority’s concerns of corporate officers evading the consequences of their wrongful conduct, in addition. to being irrelevant to the task of statutory construction, are unfounded. Other non-dischargeability provisions of the bankruptcy code, apart from section 523(a)(4), can prevent corporate directors and officers from using personal bankruptcy proceedings to escape liability for their misdeeds. Section 523(a)(2)(A), for example, provides that any debt for money obtained by “actual fraud” cannot be discharged in bankruptcy, whether or not the debtor acted in a fiduciary capacity when committing the fraud. And section 523(a)(6) states that debts “for willful and malicious injury by the debtor to another entity or to the property of another entity” will also survive bankruptcy. In short, the Bankruptcy Code provides creditors with ample protection from the shenanigans of corporate officers. But only a creditor to whom a fiduciary duty is owed by the debtor can establish non-dischargeability upon a mere showing of defalcation, and nothing more.
III.
Perhaps the conclusion reached by the majority under its multi-factor test is just another way of saying that the Ellisons’ conduct was sufficiently egregious to warrant setting aside the corporate form, and holding the Ellisons personally liable for Sovereign Travel’s debt to ARC. Whether corporate forms may be disregarded is a question of state law, and ARC has not made any argument, in this appeal or in the proceedings below, that the corporate veil should be pierced. Nor has the factual record been developed to allow this court to determine whether the Ellisons neglected the corporate forms in managing their business, whether they used the corporate form to perpetrate an injustice, or whether any of the nineteen factors that West Virginia courts consider in deciding whether to disregard the corporate form, see Laya v. Erin Homes, Inc., 177 W.Va. 343, 352 S.E.2d 93, 98 (1986), have been met.
The majority rescues ARC’S forfeiture, and its failure to develop the necessary evidence on this issue, by rejecting a textual analysis of section 523(a)(4) and replacing it with a multi-factor test for non- *278 dischargeability that will breed nothing but confusion and increased litigation.
IV.
Because the majority’s decision finds no support in the text of the bankruptcy code or in the record of the case, I respectfully dissent.

. None of these conditions is sufficient, in and of itself, to establish non-dischargeability under the majority's opinion, although I cannot tell for sure whether each of these is necessary, in the majority's view, for this provision of section 523(a)(4) to apply. To give just one example, I am at a loss to understand how the Ellisons' guarantee of Sovereign Travel's indebtedness has anything to do with non-dis-chargeability under section 523(a)(4), which asks only whether a debt is "for fraud or defalcation while acting in a fiduciary capacity.” The existence of a guarantee agreement has no bearing on whether the Ellisons committed fraud, committed defalcation, or acted in a fiduciary capacity, yet the majority includes it among the "confluence” of factors supporting its conclusion that the Ellisons’ indebtedness to ARC is non-dischargeable under section 523(a)(4).
The guarantee agreement is certainly relevant to whether a debt exists between the Ellisons and ARC, but its use as a factor in support of the non-dischargeability of that debt under section 523(a)(4) remains a mystery to me.

. An issue that the parties do not address is whether the mere use of the word "trust” in the agreement between Sovereign World Travel and ARC is sufficient to establish a fiduciary relationship between the two corporations. The contract between Great American and ARC stated:
*275 [Great American] recognizes that the proceeds of the sales, less [Great American's] commissions, on these ARC traffic documents are the property of the carrier and shall be held in trust until accounted for to the carrier.
J.A. 304. But courts have not automatically found fiduciary relationships simply because a document uses the word "trust.” See Judd v. First Federal Savings and Loan Ass’n, 710 F.2d 1237, 1241 (7th Cir.1983) ("Simply stated, the words used in a document are not always conclusive evidence of a trust. The principal consideration is intent.”); In re Long, 774 F.2d 875, 878-79 (8th Cir.1985) ("It is the substance of the transaction, rather than the labels assigned by the parties, which determines whether there is a fiduciary relationship for bankruptcy purposes.”). One could argue that, notwithstanding the language in the agreement, the ticket sale arrangements between Great American and ARC resemble more of a debtor-creditor relationship between sophisticated corporate parties, rather than the typical fiduciary relationship, where there is a difference in knowledge and power between the fiduciary and the principal. But the parties do not belabor this point, so neither do I.

. Black’s Law Dictionary includes among its definitions of "defalcation” as "the act of a defaulter” and the "failure to meet an obligation.” Black's Law Dictionary (6th ed.) 417.

. ARC alleged in its complaint that the Elli-sons submitted certain weekly sales reports that were "false and misleading,” J.A. 138, but the Ellisons denied this and the bankruptcy court "found no evidence” of this. J.A. 308. The bankruptcy court further stated that "ARC has not shown that [Sovereign Travel] actually failed to deposit monies received into the trust account at Whitesville State Bank or that [Sovereign Travel] actually withdrew monies from that account for use in daily operations.” J.A. 308. Moreover, I am unable to find (and the majority does not cite) any evidence in the record or findings of fact by any court that would support the majority’s characterization of the Ellisons' conduct as "wrongful.” At worst, it appears the Ellisons failed to meet their financial obligations at a time when their business was struggling. In the absence of fraud or manipulation, that hardly constitutes "wrongful conduct,” even though their failures would incur legal liability-